**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA TAMPA DIVISION**

UNITED STATES OF AMERICA

vs.                                            CASE NO: 8:17-CR-372-T-33TGW

TYRONE DEVLIN
_____/

## DEFENDANT'S SENTENCING MEMORANDUM

This sentencing memorandum is my story; my effort to allow the Court to learn more about Tyrone Devlin. It is incumbent on a Court to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States,* 518 U.S. 81, 113 (1996). I have a long criminal history and I have made bad choices. But it wouldn't be right to say, 'this is the sum total of who Tyrone Devlin is.' I am more than my rap sheet, more than my criminal convictions. I am more than the person portrayed in the PSR. I don't want the Court to define me by my lowest moment, but rather as a person who has also done some good in this world and a person who can be helped back into society. I want one day to live as a productive member of the community and do my best to right the wrongs committed in this case and in my past. I want a fresh start. I have been classified as a convicted felon. I have stolen from others. Those classifications and deeds are not who I am. I am a drug addict and I have made the decisions of a drug addict. I have in some fashion been addicted to a controlled substance since I was eleven years old. When I should have been playing football, basketball, and baseball with other kids, I was using cocaine and marijuana. My youth was not what was often portrayed on primetime sitcoms, but rather more akin to many somber Hollywood films; the subject matter too intense or inappropriate for middle America to watch at the 8 o'clock hour.

As a child, I did what those around me did. I love my parents. I do not love the way I was raised. The streets of Central Park in Tampa raised Tyrone Devlin. Like other children, I sought attention and praise from those I thought carried status. For me, however, I wasn't looking up to Derrick Brooks or Warrick Dunn. Rather than a proper role model in the form of a father, uncle, or coach, those that seemed to be of a higher status in my neighborhood were drug dealers or others that received their wares through what I now know were improper means. They were nice to me and let me be around them. In some ways they likely did look out for me. Whether that was due to an ulterior motive, I don't know. This was the beginning of how I got here.

I'm not here to make light of my crime. I'm not here to make excuses for my actions. I have accepted responsibility for my actions and entered a guilty plea. I did not cooperate against my co-conspirator. A large part of me wanted to; I just couldn't bring myself to do it.

Respectfully Your Honor, I ask that while fashioning a sentence for me that you consider the troubles I've had but more importantly the rehabilitative lengths I am seeking to take, starting with drug and alcohol treatment. I ask that you consider a sentence that is sufficient to meet a rehabilitative objective as that is my goal from a psychological and emotional standpoint. I want to be free of those intoxicating substances that have haunted me from adolescence. I ask that you consider ordering that the sentence in this case run in whole, or at least in part, concurrent to my undischarged State prison sentences imposed in Hillsborough County cases 15-CF-12827, 15-CF-13844, and Pasco County case number CRC15-08049-CFAES. Thank you for taking the time to get to know me, over and above case number 8:17-CR-372-T-33TGW.

## CONCURRENT v. CONSECUTIVE PRISON TERM

18 U.S.C. § 3584(a) states that, "[i]f multiple terms of imprisonment are imposed on a

defendant at the same time, or if a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively…. Multiple terms of imprisonment imposed at the same time run concurrently unless the court orders or the statute mandates that the terms are to run consecutively.  Multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently." Using the authority within 18 U.S.C. § 3584, a federal sentencing judge can specifically order the federal sentence imposed to run concurrently or consecutively to a state sentence.  Henry J. Sadowksi, *Interaction of Federal and State Sentences When the Federal Defendant is Under State Primary Jurisdiction* 3-4 (2006) citing *United States v. Williams*, 46 F.3d 57 (10th Cir.), *cert denied*, 116 S.Ct 92 (1995); *United States v. Ballard*, 6 R.3d 1502 (11th Cir. 1993); *United States v. Hardesty*, 958 F.2d 910 (9th Cir. 1992); *Pinaud v. James*, 851 F.2d 27 (2d Cir. 1988); *Salley v. United States,* 786 F.2d 546 (2d Cir. 1986) for consecutive authority and citing *United States v. Fuentes*, 107 F/3d 1515, 1519 n.6 (11th Cir. 1997) for concurrent sentencing authority.  In practice, at sentencing the Court must state on record and it must be memorialized within the judgment and sentence, the Judge's order with respect to concurrent versus consecutive time on the Federal sentence.  Henry J. Sadowksi, *Interaction of Federal and State Sentences When the Federal Defendant is Under State Primary Jurisdiction* 3-4 (2006).  "To allow the Federal sentence to commence, the Bureau of Prisons designates the state correctional institution (the primary custodian) for service of the federal sentence." *Id* at 4.

18 U.S.C. § 3584(b) guides the Court to look at 18 U.S.C. § 3553(a) factors when considering imposition of a concurrent versus consecutive sentence.  Further guidance for the court in Mr. Devlin's case is United States Sentencing Guideline §5G1.3(d).  This guideline

states that, "[i]n any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense." Commentary Application Note 4 states:

*<u>In General</u>.—Under subsection (d), the court may impose a sentence concurrently, partially concurrently, or consecutively to the undischarged term of imprisonment. In order to achieve a reasonable incremental punishment for the instant offense and avoid unwarranted disparity, the court should consider the following:*

*(i) the factors set forth in 18 U.S.C. § 3584 (referencing 18 U.S.C. § 3553(a));*

*(ii) the type (<u>e.g.</u>, determinate, indeterminate/parolable) and length of the prior undischarged sentence;*

*(iii) the time served on the undischarged sentence and the time likely to be served before release;*

*(iv) the fact that the prior undischarged sentence may have been imposed in state court rather than federal court, or at a different time before the same or different federal court; and*

*(v) any other circumstance relevant to the determination of an appropriate sentence for the instant offense."*

The conduct Mr. Devlin is accused of, specifically the search of the LaQuinta Inn on August 16, 2012, predates any conduct giving rise to his undischarged State prison terms in the above referenced Hillsborough and Pasco County cases. Should Mr. Devlin's sentence be in

accord with the recommended guideline sentence, he stands to go to prison for twelve years. If Mr. Devlin is sentenced to a consecutive sentence, this term wouldn't begin until his release date for his state charges; July 15, 2025.[1] If this were the case, Mr. Devlin would not get out of prison custody until potentially the year 2035 if he receives all Federal gain time and serves 85% of his prison sentence.

<b><u>PRELIMINARY STATEMENT</u></b>

On June 28, 2018, this Court will sentence Tyrone Devlin ("Mr. Devlin") pursuant to an open plea for violations of 18 U.S.C. § 371, Conspiracy to Defraud the United States; Theft of Government Property in violation of 18 U.S.C. § 641 and 2; Access Device Fraud in violation of 18 U.S.C. § 1029(a)(3), 18 U.S.C. § 1029(c)(1)(A)(i) and 2; and Aggravated Identity Theft in violation of 18 U.S.C. § 1028A and 2.

<b><u>APPLICATION OF THE STATUTORY SENTENCING<br>FACTORS TO THIS CASE</u></b>

We ask that the Court indulge us in consideration of the following factors in determining a sentence for Mr. Devlin:

**The Nature and Circumstances of the Offense and the History and Characteristics of the Offender.**

**(a) Nature and Circumstances of Offense.**

Mr. Devlin was charged via indictment with Conspiracy to Defraud the United States in violation of 18 U.S.C. § 371; Theft of Government Property in violation of 18 U.S.C. § 641 and 2; Access Device Fraud in violation of 18 U.S.C. § 1029(a)(3), 18 U.S.C. § 1029(c)(1)(A)(i) and 2; and Aggravated Identity Theft in violation of 18 U.S.C. § 1028A and 2 for which he pled via

---

[1] According to the Florida Department of Corrections website, an offender's "[r]elease [d]ate subject to change pending gain time award, gain time forfeiture, or review. A 'TO BE SET' [r]elease [d]ate is to be established pending review.

open plea on March 26, 2018. On August 16, 2012, Mr. Devlin, Marquis Thornton, and two unindicted alleged co-conspirators, Nathan Fagan and Jason Collins, were found in a hotel room at the LaQuinta Inn in Tampa, Florida. Within that room was stolen personal identification information ("hereinafter PII"), debit cards, debit card numbers, three laptop computers, and other paperwork containing PII notations upon it. It is alleged that this information was used to file fraudulent tax returns in the name of many victims and that the illegal acts were committed together by all co-conspirators.

Mr. Devlin pled via open plea and has admitted to the conduct required to sustain the minimum basis for the charged offenses, but maintains that his crimes were not jointly undertaken activity with his co-conspirators. Mr. Devlin was not in actual possession of any of the seized PII, nor were any of his fingerprints found on any computer. There were a total of three fingerprints belonging to Mr. Devlin on 211 items tested by fingerprint analysts between the Tampa Police Department and the Treasury Inspector General for Tax Administration Forensic Science Laboratory.

While Mr. Devlin pled to the conspiracy and accepts responsibility for his actions, he respectfully submits that his participation is overstated by the intended loss amount of $2,567,696 sought by the United States.

**(b) History and Characteristics of Mr. Devlin.**

Mr. Devlin is a thirty-year-old man born in Tampa, Florida. His childhood is a tale of misfortune and poverty. Mr. Devlin's mother, Lynette Barnes, was just a teenager when he was born, and his father, Tyrone M. Devlin, was for all intents and purposes, non-existent due to being in and out of prison. Growing up in public housing in the Central Park area, Mr. Devlin was consistently around older kids and men who dealt drugs and stole from others to make a

living. With little guidance, like many others in his position, Mr. Devlin turned to these older boys and young men for direction. As can be imagined, the guidance was typically in the wrong direction.

Mr. Devlin represented that his mother was present in his life, but offered little in the form of teaching, guidance or nurturing. Rather than work to raise Mr. Devlin and her other children, Mr. Devlin represented that she was in the streets and not present in the capacity the children needed her to be. The men Ms. Barnes selected as mates did not steer Mr. Devlin in the direction of hard work and the want for a better, legitimate life. Rather, he saw most of them deal drugs and steal from others. He saw their cash and fruits of their illegal labors and knew little else. Ms. Barnes carried no consistent employment and herself lived off the illegal fruits of the men she dated. With no father figure and a mother that was herself essentially a child, Mr. Devlin was destined to learn from those who had no real interest in his wellbeing.

Because of Ms. Barnes' age and lack of consistent presence, Mr. Devlin stayed with his grandmother more than anyone else. Despite Ms. Barnes taking her children with her to Brandon, Florida for a short period, Mr. Devlin and his siblings continued to attend school in Central Park. With no consistency, Mr. Devlin and his siblings were brought to his grandmother's home most mornings and walked to school alone. Some nights Ms. Barnes would come back to get her children and some nights she wouldn't. The children never knew whether she would show up.

Though Mr. Devlin's grandmother had the best of intentions for him, she provided little discipline or structure. A product of the same neighborhood in an earlier time, Mr. Devlin's grandmother did not encourage criminal activity or wrongdoing; however, she found nothing wrong with letting Mr. Devlin run the streets since the time he was in elementary school. As

long as he came back to her residence at night, there was little in the form of rules for Mr. Devlin.

Mr. Devlin's lack of appropriate supervision was a contributing factor to many of his life's difficulties, not the least of which is his sexual victimization at the hands of a grown cousin. At seven years old, Mr. Devlin was molested nearly every time he stayed at his Aunt's home by her son, who, at the time, was approximately 20 years old. This conduct went on for approximately two years. Too ashamed to tell anyone, Mr. Devlin remained silent and endured the abuse until his younger brother spoke of his own victimization at the hands of the same man. Despite having two children victimized by the same man, Mr. Devlin's family failed to contact the police and no further intervention aside from separation from the cousin occurred.

Mr. Devlin has been abusing cocaine since he was eleven years old. Interestingly, Mr. Devlin recalls his cocaine use beginning even prior to his use of marijuana around the same age. He recalls being impacted emotionally and psychologically by the sexual abuse and believes this, amongst other things, played a part in his drug use from such an early age. By fourteen years old, Mr. Devlin was using cocaine, marijuana, and MDMA on a regular basis. Alcohol use was daily. Between the ages of 14-15, Mr. Devlin was on his way to convicted felon status, ultimately spending time in the youthful offender wing of the Department of Corrections. At this time, he was housed with other inmates who were up to 24 years old. It was in this first prison stint that Mr. Devlin was again the subject of sexual abuse, this time repeatedly by an inmate nearly ten years older than him.

To be frank, Mr. Devlin's life has been at the edge of a downward spiral from childhood. No one was present to tell him no or discipline him when he would commit a wrong. No one shaped him as a child, an adolescent, or as a young man. In a perfect world, a child's greatest

concern should be whether or not he will make the baseball team or whether he will find his favorite video game at the store. Riding a bike to pick up basketball games and mischievously avoiding chores should be a priority. For Mr. Devlin, these typical childhood activities gave way to drug abuse and finding ways to cope with his abuse when he was only eleven years old. A lack of a formidable chance to get out of the housing projects kept him in and guided him down the path it wanted to. He has been a product of his environment.

Mr. Devlin is a man with a troubled past. Though he accepts responsibility in whole for his criminal history and seeks now to rehabilitate himself, one must wonder how much his prior addictions have affected the course of his life. Nonetheless, Mr. Devlin is cognizant of his wrongs and asks this Court to consider the language in *United States v. Adelson,* 441 F.Supp.2d 506, 513-514 (S.D.N.Y. 2006) wherein the court stated, "[b]ut, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance."

**The Need for the Sentence Imposed to Promote Certain Statutory Objectives:**

**(a)  to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.**

The need for retribution is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or other diminished capacity." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571,

590 (February 2005).

      Mr. Devlin is charged with offenses, that if the guideline calculation proposed by Federal Probation is accepted, will subject him to an approximate aggregated 10-12 year prison term possibly leading to an ultimate prison custody release in the year 2035. Mr. Devlin is cognizant that this crime is a serious one. He's had several years in State custody to reflect upon his life and understands his wrongdoings. This case's actions are no different. From a practical standpoint, looking at a sum total of time served, if Mr. Devlin is sentenced to a consecutive term of imprisonment, the seriousness of his offense will be overstated by a prison term that comes on the heels of an indictment filed two weeks before the statute of limitations ran and several years after conduct that produced his State prison sentence.

      Mr. Devlin's conspiracy names one other person, yet there were two additional men in the room who were obvious co-conspirators at the time of police interaction. Beyond that, fingerprints were found on PII in the room from at least 12 other individuals. In spite of this, Mr. Devlin may be held responsible for over two million dollars' worth of intended loss, part of which was filed by individuals he did not know and with whom were not jointly undertaking any part of his crime. The same is true for the actual loss amount sought by the United States. The United States, through their limited indictment, is attempting to find Mr. Devlin culpable for one half of the intended and actual loss, when in reality his responsibility should be considerably less based on the number of individuals known to be in the room and involved in this activity and others who almost certainly were.

      The pending charges are alleged to have occurred in 2012, nearly three years prior to his undischarged State charges and some five years before he was indicted. Though Mr. Devlin did not plea pursuant to a plea agreement, his rationale for doing so was not to be a contrarian, but

rather Mr. Devlin seeks to challenge the intended loss amount attributable to him in his case. His plea reflects his appreciation for what he's done.

      While many are asked, and do cooperate with the United States, the benefit to both the United States and the defendant has the potential to be greater when there are more co-defendants to cooperate against. Not only does cooperation provide a potential service to both parties, it is often the first step in recognizing a wrong and working to rehabilitate an offender against future recidivism. Through no fault of Mr. Devlin's, the United States waited five years to indict Mr. Devlin and Marquis Thornton. Left off of that indictment, in spite of considerable evidence to link them to the conspiracy, were Jason Collins and Nathan Fagan. Collins' and Fagan's relationship to Mr. Devlin differed from the relationship between Mr. Devlin and Marquis Thornton. As one of few non-questionable statements made by Mr. Thornton to Special Agent Lollar on February 24, 2018, Mr. Thornton is correct in his assessment that Mr. Devlin felt more for him than he did for Collins or Fagan (not to the extent that he "looked up to him" but there was a friendship loyalty present). Being as it may, Mr. Devlin felt a loyalty to Mr. Thornton and a fear of cooperation due to his upbringing. These reasons are the 'why' behind Mr. Devlin's failure to cooperate. He could not offer assistance against Collins and Fagan due to the statute of limitations having run for this case and he simply couldn't bring himself to cooperate against Marquis Thornton. Notably, Mr. Devlin does have information on others involved with this kind of fraud and through his time in the Pinellas County jail, received admissions from other inmates as to their involvement in other serious Federal offenses. Undersigned reached out to the United States on 4/12/18, 4/30/18, 5/15/18, and 5/29/18 via email regarding proffering Mr. Devlin on the cases referenced in the preceding sentence and made one phone call regarding the same. While it is certainly the government's prerogative to proffer or

not to proffer a defendant, the fact remains that Mr. Devlin was attempting to offer information in spite of being counseled as to the government's discretion with substantial assistance motions. At least one court has considered the circumstances of cooperation, a defendant's attempt to cooperate, and how that bears out for determining an appropriate sentence. *U.S. v. Jaber*, 362 F. Supp. 2d 365 (D. Mass. 2005) (in meth conspiracy, downward departure granted in part because defendant tried to cooperate repeatedly but had little to offer: "there is something troubling about the extent to which differences in sentencing were driven not by difference in the crime, but by the happenstance of the way the government indicted, the jurisdictions of indictment, and who ran to cooperate first.").

As referenced earlier in this memorandum, Mr. Devlin has been addicted to drugs since he was eleven years old. It is likely that his drug abuse was initiated both as a product of his environment and as an attempt to self-medicate the psychological issues stemming from being the victim of sexual abuse. Considering his upbringing, it is not surprising that Mr. Devlin continued to self-medicate as an adult and likely suffers from undiagnosed depression and anxiety.

On August 16, 2012, Mr. Devlin was not found to be in possession of a myriad of the finer things in life. He drove an old car, owned pretty much what he had on his person, and had been using drugs the night before. Unlike many others indicted in this District for similar crimes, Mr. Devlin was not in possession of flashy jewelry nor was he throwing lavish birthday parties for his child. He has a drug issue and the vast majority of any monies he received through his crimes went to support his drug habit. In short, Mr. Devlin needs treatment to address his psychological wounds from being molested as a child. He has used drugs to cope with these issues and ultimately his criminal history, including these crimes, reflect an addict's

efforts to fuel his addiction.

**(b) to afford adequate deterrence to criminal conduct.**

"There is generally no significant association between perceptions of punishment levels and actual levels … implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms." Gary Kleck, et al, *The Missing Link in General Deterrence Theory,* 43 Criminology 623 (2005). Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id.*; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."). Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id.* at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." *Id.* at 2. The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent

effects." *Id*. at 1.  Research regarding white collar offenders in particular (presumably the most rational of potential offenders) found no difference in the deterrent effect of probation and that of imprisonment. *See* David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); *see also* Gabbay, *supra*, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").  According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

While the aforementioned studies often compare noncustodial sentences to custodial sentences, the spirit of the findings is that a longer prison term is not effective as a deterrent for recidivism.  As such, a longer sentence for Mr. Devlin will not further deter criminal conduct, especially one where the sentence length could potentially be impacted drastically by an undischarged sentence for conduct post-dating the conduct at issue in this case.  Practically speaking, time served is time served.  It is unlikely that a defendant will bifurcate his sentences and analyze them in that capacity.  Rather they will look at the total time incarcerated.  Based upon the data listed above, imposing a consecutive sentence to Mr. Devlin's undischarged State sentences will not act to deter future crimes and as such would be a greater than necessary sentence out of accord with 18 U.S.C. § 3553(a).

**(c) to protect the public from further crimes of the defendant and provide the offender with needed medical care.**

As mentioned earlier in this memorandum, Mr. Devlin has battled drug addiction from an early age.  Though his crime is one of fraud, Mr. Devlin has been addicted to drugs since

adolescence. A look at his criminal history validates this as his crimes are those commonly associated with drugs or obtaining money for drugs. This statement is not in an effort to excuse his past conduct or make light of it, but rather to submit to this Honorable Court that he is *the* individual envisioned when the RDAP program was created. Mr. Devlin, despite prior stints in the Florida Department of Corrections, has yet to receive drug rehabilitation and treatment. One must question Mr. Devlin's station in life had he actually received drug treatment in the past. Would he be here? The answer is unattainable but it is without question that drug treatment has never hurt anyone. RDAP is available and Mr. Devlin prays that this Court will avail him of such opportunity. "The Bureau of Prisons undertook an evaluation of its residential drug abuse treatment program by assessing the post-release outcomes of inmates who had been released from BOP custody. The evaluation, conducted with funding and assistance from the National Institute on Drug Abuse, reveals that offenders who completed the residential drug abuse treatment program and had been released to the community for three years were less likely to be re-arrested or to be detected for drug use than were similar inmates who did not participate in the drug abuse treatment program. Specifically, 44.3 percent of male inmates who completed the residential drug abuse treatment program were likely to be re-arrested or revoked within three years after release to supervision in the community, compared to 52.5 percent of those inmates who did not receive such treatment." Federal Bureau of Prisons Office of Research and Evaluation. (September 2000). *TRIAD Drug Treatment Evaluation Project Final Report of Three-Year Outcomes: Part 1*. Retrieved June 12, 2018 from https://www.bop.gov/resources/pdfs/TRIAD/TRIAD_pref.pdf.

    Considering the previously cited study, RDAP is a mutually beneficial opportunity to both Mr. Devlin and the Bureau of Prisons in that recidivism is lowered as is the chance of

relapse.  Less recidivism means increased protection for the public from potential future crimes committed by Mr. Devlin.

**(d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

Mr. Devlin has his GED in addition to a vocational certificate in the electrical field.  Mr. Devlin would like to expand upon his electrical training wherever he is designated as he feels that would allow him to make a reasonable and honest living upon his release from prison in a field that is always in demand.  According to the "Inmate Occupational Training Directory" produced by the bureau of prisons in 2017, Electrical Apprenticeship (48 month program) is available to inmates at Marianna FCI, Miami FCI, Tallahassee FCI, and Pensacola FPC.  Electrician training (18 month program) is available to inmates at Coleman USP I and II, Coleman Low FCI, and Coleman Medium FCI.  *Id.*

Mr. Devlin can easily achieve his educational, vocational and rehabilitative goals while incarcerated.  In order for these objectives to be most effectively achieved Mr. Devlin should be able to use what he's learned as close to training completion as possible.  Respectfully, Mr. Devlin requests a sentence no longer than necessary to achieve his educational, vocational and substance abuse goals.

**The Sentencing Range Established by the Sentencing Commission.**

Mr. Devlin pled via open plea for violations of 18 U.S.C. § 371, Conspiracy to Defraud the United States; Theft of Government Property in violation of 18 U.S.C. § 641 and 2; Access Device Fraud in violation of 18 U.S.C. § 1029(a)(3), 18 U.S.C. § 1029(c)(1)(A)(i) and 2; and Aggravated Identity Theft in violation of 18 U.S.C. § 1028A and 2.  His criminal history category is a level six.

Federal Probation calculates Mr. Devlin's total offense level at 23 for a recommended guideline sentence of 92-115 months with 24 months to run consecutively for the aggravated identity theft. Mr. Devlin has objected and maintains his objection to this guideline calculation.

**The Need to Avoid Unwarranted Disparities**

It is incumbent on the Court to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Koon v. United States,* 518 U.S. 81, 113 (1996

With respect to a disparate sentence being imposed in credit card fraud cases, 26.2% of credit card fraud cases in 2016 received non-government sponsored below guideline range sentences. United States Sentencing Commission Fraud Team Datafiles, 2013 through 2016, USSCFTFY13-USSCFTFY16. Retrieved on June 12, 2018 from https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Credit_Card_Fraud_FY16.pdf. Government benefit fraud offenders received a non-government sponsored below guideline range sentence in approximately 1/3 of all cases heard between 2013 and 2016. United States Sentencing Commission Fraud Team Datafiles, 2013 through 2016, USSCFTFY13-USSCFTFY16. Retrieved on June 12, 2018 from https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Government_Benefits_Fraud_FY16.pdf. Considering this information, district courts throughout the United States have shown a willingness to vary from the guidelines with their sentences. With more and more courts imposing below guideline sentences on their own volition, disparate sentences focusing on the uniqueness of the case and individual have become common place.

**The need to provide restitution to any victims of the offense.**

In determining the appropriate sentence, this Court must consider "the need to provide restitution to any victims of the offense." *See* 18 U.S.C. §3553(a)(7); *see also*, *e.g.*, *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006) (acknowledging district court's discretion to depart from guidelines to impose probationary sentence, since the "goal of obtaining restitution for the victims of Defendant's offense . . . is better served by a non- incarcerated and employed defendant"); *United States v. Peterson*, 363 F. Supp. 2d 1060, 1061- 62 (E.D. Wis. 2005) (granting a variance so that defendant could work and pay restitution).

Mr. Devlin intends on furthering his education in the electrical field while in prison. His desire upon release is to relocate and get away from his old neighborhood and the troubles that come with it. He wishes to treat his addiction issues, learn to cope with his past abuses appropriately, and earn a living without having to look over his shoulder daily. While restitution will take time to pay, Mr. Devlin is on the right path to make that happen. Should he be sentenced to a fully consecutive prison term, it is possible that he may not be released until 2035, thereby causing a much longer than necessary delay in reimbursement. By then he will be 47 years old and depending on his health at that time, may be less likely to be able to pay restitution in full. This Court should seek to maximize, rather than eliminate, Mr. Devlin's ability to make the restitution demanded.

## Conclusion

For the foregoing reasons, Mr. Devlin respectfully submits that a term of imprisonment concurrent in whole, or at least in part, to his undischarged prison term served for Hillsborough County cases 15-CF-12827, 15-CF-13844, and Pasco County case number CRC15-08049-CFAES is sufficient but not greater than necessary to comply with the statutory directives set forth in 18 U.S.C. § 3553.

Respectfully submitted this 15th Day of June, 2018.

/S/ Jason M. Mayberry
MAYBERRY LAW FIRM
Jason M. Mayberry
FBN- 36212
Attorneys for the Defendant
3902 Henderson Boulevard
Suite 208-136
Tampa, FL 33629
Ph-813-444-7435
Fx-727-755-0098

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished by CMECF to the Office of the United States Attorney, this 15th day of June, 2018.

/S/ Jason M. Mayberry
JASON M. MAYBERRY, Esq.