UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


UNITED STATES OF AMERICA,        ) Tampa, Florida
                                 )
                    Plaintiff,   ) No. 8:17-cr-372-T-33TGW-1
                                 ) Docket No. 141
                                 )
             vs.                 ) June 28, 2018
                                 )
TYRONE DEVLIN,                   ) 10:00 a.m.
                                 )
                    Defendant.   ) Courtroom 14B
_____  )


**TRANSCRIPT OF SENTENCING HEARING**
BEFORE THE HONORABLE VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE


*Official Court Reporter:*

*Scott Gamertsfelder, RMR, FCRR*
*801 North Florida Avenue*
*Tampa, Florida 33602*
*Telephone:  (813) 301-5898*

*(Proceedings reported by stenotype; Transcript produced by computer-aided transcription.)*

### A P P E A R A N C E S

**GOVERNMENT COUNSEL:**

    **Amanda Lynn Riedel, Assistant U.S. Attorney**
    United States Attorney's Office
    400 North Tampa Street, Suite 3200
    Tampa, Florida 33602
    (813) 274-6000

**DEFENSE COUNSEL:**

    **Jason M. Mayberry, Esq.**
    The Mayberry Law Firm, LLC
    3902 Henderson Boulevard
    Tampa, Florida 33629
    (727) 771-3847

                  **ALSO PRESENT:**

                    Tyler Campbell,
                    Probation Officer

                    Sharla Canfield, Detective,
                    Tampa Police Department

                    Jennifer Arbutina,
                    IRS Special Agent

                    Joshua Lollar,
                    Veteran Affairs Special Agent

               - - -

## TABLE OF CONTENTS

### EXAMINATIONS

| **GOVERNMENT WITNESS:** | **DIRECT** | **CROSS** | **REDIRECT** | **RECROSS** |
|---|---|---|---|---|
| SHARLA CANFIELD | 17 | 43 | | |

| **DEFENDANT WITNESS:** | **DIRECT** | **CROSS** | **REDIRECT** | **RECROSS** |
|---|---|---|---|---|
| TYRONE DEVLIN | 72 | 79 | | |

### EXHIBITS

| **GOVERNMENT** | **PAGE** | **LINE** |
|---|---|---|
| 1....................... | 39 | 7 |

| **COURT** | **PAGE** | **LINE** |
|---|---|---|
| 1....................... | 139 | 24 |

- - -

1               **P R O C E E D I N G S**

2  June 28, 2018                                    10:15 a.m.

3                        - - -

4               COURT SECURITY OFFICER:  All rise.

5               The United States District Court in and for the

6  Middle District of Florida is now in session.  The Honorable

7  Virginia M. Hernandez Covington presiding.

8               Please be seated.

9               THE COURT:  Good morning.  We are here for the

10  sentencing in United States versus Tyrone Devlin, Case No.

11  8:17-cr-372-T-33TGW.

12               I'll begin by having counsel state their

13  appearances.  Who do we have for the government?

14               MS. RIEDEL:  Good morning, Your Honor.  Amanda

15  Riedel for the United States.  I'm here with Detective Sharla

16  Canfield, IRS Special Agent Jennifer Arbutina, and VA Special

17  Agent Joshua Lollar.

18               THE COURT:  Thank you.  And for the defendant?

19               MR. MAYBERRY:  Good morning, Your Honor.  Jason

20  Mayberry on behalf of Tyrone Devlin.  He's present and seated

21  to my right.

22               THE COURT:  Thank you.  We have Miss Campbell from

23  probation.  Let me just see counsel for a moment at sidebar.

24               (*The following was held at sidebar:*)

25               THE COURT:  Your client wrote this letter.  Did he

1    discuss it with you, Mr. Mayberry?

2          MR. MAYBERRY:  No.

3          THE COURT:  Because I will have to inquire about

4    it.  He wrote a letter, and he says he recognizes that he's

5    scheduled to be sentenced today, and he is advising the Court

6    that he's having some issues with you and that he's provided

7    you with the information that he would like to cooperate with

8    and give substantial assistance to the government, but those

9    efforts to make this happen, he says, have not been

10   reasonable.

11         He believes there is an answer to this problem.

12   He said that you made a statement a few months back "You

13   can't roll on who you want to roll on.  You can't cooperate

14   against who you want to cooperate against.

15         "The reason I made the statement is because the

16   government wanted me to cooperate in the case against my

17   co-defendant," but that he refused.  He said, "I did not

18   refuse because I did not want to cooperate against my

19   co-defendant," but because he felt like the government was

20   not going to treat him fairly.  He would have had to take a

21   plea deal, waive all his appellate rights, agree to the

22   factual basis, even if the factual basis included conduct

23   that was outside the scope of what he did, which is the

24   conduct of the entire conspiracy.  That was not in his best

25   interest.

1           "All of the above would have had a negative effect

2      on my sentencing guidelines.  I would not have been able to

3      challenge it because I agreed to it.  Now, as an American

4      citizen who has violated the law, I would like to redeem

5      myself from this curse that I have brought upon myself

6      through cooperation with the government, to show my

7      rehabilitative intent by assuming the fundamental civic duty

8      of reporting crime.

9           "I am pretty sure the Assistant U.S. Attorney in

10     this case, whoever he or she is, would want to hear what I

11     got to say.  This case involves heroin/fentanyl distribution,

12     resulting in death.  It was multiple overdoses in this case.

13     I got detailed information on what happened.  I also got

14     confession statements made by one of the defendants,

15     admitting he sold drugs and someone overdosed.

16          "These are some of the names of some of the people

17     named in the Indictment, though the names" it can be

18     discovered -- or "through the names" -- I'm sorry -- "it can

19     be discovered who I need to talk to.  Hasan Pearson, Salik

20     Stevens, Ladarius Oglesby, last name of another co-defendant

21     is Lampkins, and William Jones."

22          That's the letter received on June 22nd, received

23     by probation on June 21st and sent to me.

24          MR. MAYBERRY:  Is he asking in that letter to fire

25     me?

1          THE COURT:  I'm going to ask him.  I just didn't

2    want to -- I want to alert you first before I ask him.  I'm

3    not certain what his complaint exactly is.  I need to make

4    some inquiries.  Let me ask, what do you think about all

5    this, Miss Riedel?

6          MS. RIEDEL:  Your Honor, although I am new to this

7    case, I've spent a substantial amount of time, both while it

8    was going on and when I entered an appearance, getting up to

9    speed.  I've spoken with Miss Kistler at length.  This

10   defendant has been disingenuous with the government, with the

11   Court, and with his lawyer.  He wants his cake -- to have his

12   cake and eat it, too.

13         THE COURT:  That's the saying.

14         MS. RIEDEL:  Whatever the phrase is.

15         He did not want to enter into a plea agreement.

16   He did not want to admit anything.  He had trouble getting

17   through his change of plea, and even now we are prepared to

18   go forward to a contested sentencing.  So when he approached

19   about the possibility of cooperation, which Mr. Mayberry has

20   been a constant advocate for his client, we said, no, because

21   you can't admit your own conduct fully and you haven't

22   entered into a plea agreement that leaves out everybody's

23   rights.

24         By the way, the information he wants to give, it

25   sounds like, is an indicted case already, but I have no

1  problem continuing this sentencing and allowing him more time

2  to cooperate.  But I would like the opportunity to put on the

3  record in front of him that in order to do that, he would

4  have to enter into an agreement with the United States,

5  waiving his appellate rights and agreeing to the facts.

6            THE COURT:  Because he has not signed a plea

7  agreement.

8            MS. RIEDEL:  No, he pled open.  Until we got that,

9  we didn't have the rights to either party laid out, but our

10  responsibilities would be to each other.  Also, he could be

11  testifying for the government in one case and fighting us in

12  the appellate courts in another case, and so that's not how

13  we do cooperation.

14            So I want him to understand that's not

15  Mr. Mayberry's fault or any defense attorney's fault.  That's

16  the government's policy, and he has to come clean on

17  everything, of course.  Not just in his own case, but in

18  anything else.

19            THE COURT:  Mr. Mayberry?

20            MR. MAYBERRY:  I have reached out, Your Honor.

21  From the beginning there was a reservation on his part about

22  testifying against Marquis Thornton.  These are people that

23  have grown up in the same neighborhood and knows them.  I

24  think he had some genuine reservations of that due to a

25  personal relationship that he's had with him and his family.

1   I also think there was a reservation because they were in the

2   same neighborhood and he's afraid of the snitch jacket.

3             THE COURT:  Sure.

4             MR. MAYBERRY:  I have had a number of

5   conversations with him with respect to that and explained to

6   him how that would affect him.  How it would essentially

7   affect his guidelines and cap him at seven years.  I

8   explained to him --

9             MS. RIEDEL:  Because there were plea offers that

10  were substantially more favorable than what he ultimately

11  decided to do, to plead open.

12            MR. MAYBERRY:  Ultimately, I consulted with him on

13  that.  In addition to what he's dealing with, he's here on a

14  writ.  So he has the issue of concurrent versus consecutive.

15            Ultimately, here, he did want to cooperate

16  against -- I don't know all the names, from him, but I have

17  reached out.  There just hasn't been any response from the

18  government in this.  I've explained to him that's the

19  government's prerogative and who they want to proffer and who

20  they don't.

21            MS. RIEDEL:  Because of the no plea agreement,

22  because of no admission of facts, because of no admission of

23  the loss, because no waiver of his appellate rights and

24  because he would want to pick and choose who he wanted to

25  cooperate against.

1          THE COURT:  How long do you anticipate this

2    hearing will take this morning?

3          MS. RIEDEL:  I have to put -- because he's

4    objected to both the loss number and the conduct giving rise

5    to the loss, I have to put on a witness.  I expect her direct

6    to be about 40 minutes.  I don't think my argument will be

7    substantially long after that.

8          THE COURT:  All right.  That's fine.  I will ask

9    him and we will see.  I will just tell you, at about a

10   quarter to 12 so -- it's 10:25.  I have agreed to do

11   something with the federal bar, that I've got to participate

12   in a luncheon panel, so I have to leave at a quarter to

13   twelve because I'm one of the speakers.

14         MS. RIEDEL:  I think part of the problem is going

15   to be he's going to want to testify, I'm guessing.

16         THE COURT:  We can resume this later this

17   afternoon if we are not finished.  I want to see what he has

18   to say.  It's up to him, but we will get started.

19         You have witnesses.  We will get started.  I'm

20   saying, at a quarter to twelve I will have to stop and we

21   will resume later this afternoon or -- it has to be late this

22   afternoon.  I need to get back from that luncheon, which is

23   also a program, or it could be later in the week or next week

24   as well.

25         MS. RIEDEL:  Okay.

1          THE COURT:  All right.

2          MS. RIEDEL:  Thank you.

3          (*Sidebar ended.*)

4          THE COURT:  Mr. Devlin, I spoke to both

5    Miss Riedel, who is the Assistant U.S. Attorney, and

6    Mr. Mayberry at sidebar.  I just have a couple of questions

7    for you.

8          We are ready to move forward with the sentencing

9    today, but what I had addressed with them is some of the

10   matters that you had previously addressed with me.  So today,

11   we are ready to proceed with sentencing.  You have not signed

12   a plea agreement, which is perfectly fine.  Some defendants

13   do; other defendants don't.  Just depends on the

14   circumstances, et cetera.  But this is a contested hearing,

15   and we are ready to move forward.

16         So I didn't know if there was anything that you

17   wanted to say with respect to this hearing, with respect to

18   the circumstances.  I discussed with counsel the letter you

19   sent to me.  I want to make certain you are ready to -- we

20   are ready to move forward today.  The government has its

21   witnesses.  It's ready to proceed.

22         Is there anything that you would like to tell the

23   Court?

24         THE DEFENDANT:  I'm trying to figure out what you

25   are trying to ask me right now.

1          THE COURT:  Well, what I'm trying to ask, in a

2     roundabout way, is that you had indicated your desire to

3     cooperate --

4          THE DEFENDANT:  Yes.

5          THE COURT:  -- to cooperate with the government.

6     The problem is, Mr. Devlin, for the government to utilize

7     that cooperation, normally they require a plea agreement.

8          Is that right, Miss Riedel?

9          MS. RIEDEL:  Yes, Your Honor.  We would require an

10    individual who wanted to cooperate to enter into a written

11    plea agreement with a stipulated and agreed statement of

12    facts, which in this case would have to be an agreed-to loss

13    figure, a realistic statement of what they did wrong, as well

14    as an appellate waiver so that we were not cooperating on the

15    one hand with a defendant and fighting on the other in an

16    appellate court.

17         THE COURT:  Right.  So that's the way that works.

18    And so your election was to plead, what we call, without the

19    benefit of a plea agreement.  And, again, the reasons for

20    doing that, they are logistical and strategic reasons why you

21    would do one versus the other.  That's the path that you have

22    chosen to take.

23         So now to say that you want to cooperate -- while

24    cooperation is always open -- even after sentencing it's

25    possible to cooperate.  You just do it on a Rule 35.  That's

 1    always open.  That door is never closed.  It's just that what

 2    you have to offer, I'll just say it's worth more at certain

 3    parts of the proceeding.  It's the sooner you do it it's

 4    normally worth more; and, if you plead with a plea agreement,

 5    it's worth more to the government.

 6           THE DEFENDANT:  I understand that right there, but

 7    I never got around to discuss anything about any stipulated

 8    facts or what we would agree to come to.  We never got to

 9    that point where we could get that.

10           If that was presented, then I would have, you

11    know, maybe agreed to take a plea agreement.  But I just

12    don't want to take a plea agreement and basically accept

13    everything that they are saying that happened.

14           THE COURT:  Well, that's the way it works.

15           Right, Miss Riedel?

16           MS. RIEDEL:  Yes, Your Honor.  I can represent for

17    the United States that there were extensive discussions with

18    counsel on behalf of Mr. Devlin; that counsel came back to

19    the United States, worked on trying to reach a loss figure.

20           The United States is not going to enter into any

21    plea agreement that doesn't fairly and truthfully represent

22    the facts.  The United States believes Mr. Devlin as a

23    knowing participant in this conspiracy is responsible for the

24    loss associated with the conspiracy.

25           Mr. Devlin cannot enter into a plea agreement

1  where he does not admit to those facts in that loss number.

2  The government won't be a party to it.

3          THE COURT:  He's already pled open in front of the

4  magistrate judge.  The magistrate judge went through a

5  colloquy with you.  So, Mr. Devlin, we are moving forward

6  today.  All right?

7          THE DEFENDANT:  All right.

8          THE COURT:  So that's it.

9          Tyrone Devlin, on March 26, 2018, you enter a plea

10 of guilty to Count One through Four of the Indictment, Count

11 One charging you with conspiracy to defraud the United

12 States, in violation of Title 18, United States Code, Section

13 371; Count Two charging you with theft of government

14 property, in violation of Title 18, United States Code,

15 Section 641 and 2; Count Three charging you with access

16 device fraud, in violation of Title 18, United States Code,

17 Sections 1029(a)(3)(C)(1)(A)(i) and 2; and Count Four,

18 charging you with aggravated identity theft, in violation of

19 Title 18, United States Code, Sections 1028(a) and 2.

20         The Court has previously accepted your guilty plea

21 and has adjudged you guilty of those offenses.  We have now

22 reached the stage in the proceedings where it is my duty to

23 address several questions to you and your attorney and the

24 counsel for the government.

25         Miss Riedel, have you had the opportunity to read

1   the presentence report?

2               MS. RIEDEL:  Yes, Your Honor.

3               THE COURT:  Do you have any objections as to the

4   factual accuracy of the report?

5               MS. RIEDEL:  No, Your Honor.

6               THE COURT:  Do you wish to make any objections to

7   the probation officer's application of the guidelines?

8               MS. RIEDEL:  No, Your Honor.

9               THE COURT:  Thank you, Miss Riedel.

10              Mr. Mayberry, have you had the opportunity to read

11  and discuss with Mr. Devlin the presentence report?

12              MR. MAYBERRY:  Yes, Your Honor.

13              THE COURT:  Do you have any objections as to the

14  factual accuracy of the report?

15              MR. MAYBERRY:  We do, Your Honor.  Our objections

16  were noted in the memorandum that we have provided to

17  probation with the initial report.  We would stand by those

18  objections.

19              THE COURT:  Likewise, do you wish to make any

20  objections to the probation officer's application of the

21  guidelines?

22              MR. MAYBERRY:  Yes, Your Honor.

23              THE COURT:  Okay.  And it's based on the same

24  objections?

25              MR. MAYBERRY:  Yes, Your Honor.

1        THE COURT:  So going through this, I'm looking at

2   the objections that have been raised by Mr. Mayberry on

3   behalf of Mr. Devlin.  We have objections to paragraphs 9

4   through 11, 29B, and 29H, intended loss amount and number of

5   victims.

6        The defendant objects to the intended loss

7   calculation of $2,567,696, and he also objects to the

8   guideline enhancement for the number of victims.  He objects

9   to a two-level increase with respect to that.

10        So those are the two objections that I see.  Did I

11   find them correctly, Mr. Mayberry?  Was there anything else?

12   Those are the two that I see.

13        MR. MAYBERRY:  There was a -- Your Honor, I'm not

14   sure if you mentioned 29D.

15        THE COURT:  I meant to.  So it's 9 through 11, 29B

16   and 29D, intended loss amount and number of victims.  That's

17   right.  Then, paragraphs 13 through 20, 29C as well.  That's

18   the number of victims as well as the intended loss amount.

19        So, Miss Riedel, I understand you have some

20   testimony you would like to present.

21        MS. RIEDEL:  Yes, Your Honor.

22        THE COURT:  With respect to the loss amount,

23   correct?

24        MS. RIEDEL:  It will be all of it, Your Honor.

25   And because I think that the defendant is not only objecting

1   to the accuracy of the defendant's numbers for loss, but the

2   factual underpinnings that involve him in the conspiracy for

3   purposes of relevant conduct, I'll call Detective Canfield to

4   testify about the facts in the case, her loss analysis, and

5   the number of victims.

6           THE COURT:  I'm happy to have you call your

7   witnesses now.

8           MS. RIEDEL:  The United States calls Detective

9   Canfield.

10          THE COURT:  Detective Canfield, please come

11  forward to be sworn in.

12          THE COURTROOM DEPUTY:  Please raise your right

13  hand.

14          Do you solemnly swear or affirm under penalty of

15  perjury that the testimony you shall give in this cause will

16  be the truth, the whole truth, and nothing but the truth?

17          THE WITNESS:  I do.

18          THE COURTROOM DEPUTY:  Please state your name for

19  the record and spell your last name.

20          THE WITNESS:  Sharla Canfield, C-a-n-f-i-e-l-d.

21          THE COURT:  You may proceed, Miss Riedel.

22                       SHARLA CANFIELD,

23  having been first duly sworn by the Courtroom Deputy,

24  testified as follows:

25                       DIRECT EXAMINATION

1   BY MS. RIEDEL:

2   Q.    Good morning, Detective Canfield.

3   A.    Good morning.

4   Q.    Who do you work for?

5   A.    Tampa Police Department.

6   Q.    What is your job there?

7   A.    Economic crimes detective.

8   Q.    Are you also with a task force agency?

9   A.    I am.  IRS, FBI, and the Secret Service.

10  Q.    Do you have a background of investigating stolen

11  government funds or the other identity theft crimes?

12  A.    I do.

13  Q.    How long have you been working on these cases?

14  A.    Since about 2010.

15  Q.    How many total surf cases do you think you've worked on

16  in your career?

17  A.    Hundreds.

18  Q.    All right.  Are you familiar with an individual named

19  Tyrone Devlin?

20  A.    I am.

21  Q.    How about his co-conspirators?

22  A.    Yes.

23  Q.    Were you one of the investigators that collected and

24  reviewed evidence in this case?

25  A.    Yes.

1   Q.    In your role as both a TPD detective and the IRS TFO?

2   A.    Yes.

3   Q.    Can you tell us how this case started?

4   A.    This case started on August 16th, 2012.  Tampa Police

5   Department officers were on an unrelated call at the LaQuinta

6   Inn.  There was a room that smelled of marijuana, so they ran

7   the tag of the vehicle -- of the vehicle that was parked out

8   in front of it, which was a white Mercury Marquis.  That

9   vehicle came back registered to Tyrone Devlin, who had an

10  active warrant out for his arrest.

11  Q.    Was a search done of the hotel room?

12  A.    Yes.

13  Q.    Who was present in the hotel room?

14  A.    Tyrone Devlin, Marquis Thornton, Jason Collins, and

15  Nathan Fagan.

16  Q.    What items of evidentiary value were recovered from the

17  hotel room?  Let me have you -- you are referring to reports?

18  A.    Yes.

19  Q.    Is that your report?

20  A.    Yes.

21  Q.    Did you provide that to prosecutors, and was it turned

22  over in discovery in this case?

23  A.    Yes.

24  Q.    Are there other police reports that you are referring

25  to?

1   A.    Yes.  I have multiple reports I'm referring to that

2   were all turned over.

3   Q.    So you ensured that all of those were provided in

4   discovery?

5   A.    Yes.

6   Q.    Okay.  All right.  So I had asked you what items of

7   evidentiary value were found in the hotel room.

8   A.    Yes.  There were over 1900 identifiers located in the

9   hotel room, meaning names, dates of birth, social security

10   numbers, debit card numbers, and credit card numbers.

11          Further, there were 74 prepaid debit cards and

12   additional prepaid debit card mailers, as well as a driver's

13   license, suspended delinquency notice that was addressed to

14   Tyrone Devlin, and that was mailed to his address on Whittier

15   Street, as well as computers, cell phone, and a wireless

16   router.

17   Q.    So I want to talk to you about the more than 1900

18   names, dates of birth, social security numbers, and account

19   numbers.  In your experience, is this consistent with

20   individuals who are committing stolen identity refund fraud?

21   A.    Yes.

22   Q.    How are these pieces of what I am going to call PII,

23   personal identification information, found?  What were they

24   contained in?

25   A.    They were found in ledgers.  They were found on -- you

1   get the little memo pad inside hotel rooms.  A lot of the

2   information was written on LaQuinta Inn memo pads, and then

3   there were multiple different notebooks.  There was loose

4   paper that was found.  There were medical records that were

5   found in the hotel room.

6   Q.    For these more than 1900 pieces of PII, including

7   medical records, did any of them belong to Tyrone Devlin

8   other than that mailing you had told us about from the DMV

9   about his driver's license?

10  A.    I believe one of the card numbers recovered was in his

11  name.

12  Q.    So other than that, more than 1900 belonged to other

13  people?

14  A.    Yes.

15  Q.    Not Mr. Devlin?

16  A.    Correct.

17  Q.    Were these hidden or were they open and out in the

18  hotel room?

19  A.    They were both.  They were strewn across the hotel

20  room, in the corners, on the dressers, in the dressers, in

21  some bags, but basically in plain view when officers arrived

22  on scene.

23  Q.    In your experience investigating the SURF offenses, how

24  and why are these ledgers used?

25  A.    They are used to keep track of fraudulent tax returns

1    that have been filed.  Typically they will have the e-mail

2    address that's used, name, date of birth, social security

3    number, as well as the account number, where the money is

4    supposed to be loaded, and usually they will notate a number

5    out to the side as to what the intended refund amount is.

6    Q.    Did you also mention there were at least 74 reloadable

7    debit cards in the room?

8    A.    Yes.

9    Q.    Is that based on your experience and indicia of stolen

10   identity refund fraud?

11   A.    Yes.

12   Q.    How are debit cards used in SURF offenses?

13   A.    The debit cards are used so that the fraudulent tax

14   return that is filed can be loaded onto the debit card, where

15   the individual now has access to the funds to use at retail

16   establishments or ATMs.

17   Q.    Can you also transfer funds between reloadable debit

18   cards?

19   A.    You can.

20   Q.    Were these debits cards in other people's names?

21   A.    Yes.

22   Q.    Was Mr. Devlin searched?

23   A.    Yes.

24   Q.    And did they locate anything on his person?

25   A.    Yes.  He was found in possession of over 2600 in his

1    pocket.

2    Q.    One of the objections -- did you review the defendant's

3    objections to the PSR?

4    A.    I did.

5    Q.    One of the factual objections was that the defendant --

6    there was no evidence that the defendant benefited from the

7    conspiracy.  Is that what was found by law enforcement when

8    they searched him?

9    A.    He had money on him when he was searched by law

10   enforcement.

11   Q.    Are you aware of Mr. Devlin having a job --

12   A.    No.

13   Q.    -- at this time?

14         And you mentioned medical records.  Some of the

15   PII found in the room, where was it from?  What kind of

16   medical records were they?

17   A.    VA medical records that were recovered.

18   Q.    Were any of these VA patients Mr. Devlin or the other

19   three individuals in the room?

20   A.    No.

21   Q.    Among the debit cards found in the room, was one of

22   them an H&R Block card ending in 3554?

23   A.    Yes.

24   Q.    Where was that card found?

25   A.    That credit card was found in the pocket of Marquis

1  Thornton.

2  Q.    Did you do some investigation as to the source of funds

3  on this card?

4  A.    Yes.

5  Q.    Was this a reloadable debit card?

6  A.    Yes.

7  Q.    Is H&R Block a tax filing service?

8  A.    It is.

9  Q.    Do they issue reloadable debit cards?

10  A.    They do.

11  Q.    For what purpose?

12  A.    At that time -- well, at any time, it's a prepaid debit

13  card, so any funds can be loaded onto it; but typically with

14  the H&R card, it's loaded with tax refunds onto the card.

15  Q.    And so what did you determine was the source of income

16  onto these cards?

17  A.    So this card in particular had an initial deposit from

18  Green Dot, so a wire transfer from one card to another card

19  was done at the beginning.

20  Q.    Well, I should have asked you, what was the date of the

21  search of the hotel room where Mr. Devlin was present?

22  A.    The date of the search was August 16th, 2012.

23  Q.    All right.  In looking at these -- were you about to

24  say -- well, tell me what you said as to the source of funds

25  on this card.

1  A.     The first fund was loaded onto the card on August 10th,

2  and that was a deposit from Green Dot for a thousand dollars,

3  but then there was a fraudulently obtained tax refund that

4  was loaded onto the card on August 15th, 2012.

5  Q.     Was that the day before the hotel room?

6  A.     Yes.

7  Q.     What was the amount of that refund?

8  A.     8,958.

9  Q.     Who was it issued to?

10  A.     The refund was in the name of David Clay.

11  Q.     Who was the H&R Block card issued to?

12  A.     An individual by the name of Dempsey Reid.

13  Q.     Were any of these people interviewed?

14  A.     Dempsey Reid was interviewed.

15  Q.     And what did he or she say about this H&R Block card in

16  their name?

17  A.     Hold on one second.  He said he didn't authorize any

18  fraudulent tax refund to be loaded onto that card and that he

19  didn't know how that card was opened up in his name.

20  Q.     So the day before the search there is an 8,958 tax

21  refund loaded onto the card?

22  A.     Yes.

23  Q.     Were there any other tax refunds that were direct to

24  this card but were blocked by the IRS?

25  A.     Yes.

1  Q.    How many?

2  A.    I believe there were nine.

3  Q.    And were any of those refunds in Mr. Devlin's name?

4  A.    No.

5  Q.    Or Mr. Thornton's name?

6  A.    No.

7  Q.    Were they all fraudulently filed refunds?

8  A.    Yes.

9  Q.    Or returns, I should say.

10 A.    Yes.

11 Q.    Was Mr. Devlin found on surveillance video using this

12 debit card?

13 A.    Yes, he was found on surveillance video using the card

14 on the morning of the August 15th, using an ATM located at

15 5002 East 10th Avenue in Tampa.

16 Q.    Is August 15th the same day the refund was loaded?

17 A.    Yes.

18 Q.    Is it also the day before the search of the hotel room?

19 A.    Yes.

20 Q.    Was anyone with him when he used the card?

21 A.    There was a passenger in the car that is believed to be

22 Marquis Thornton.

23 Q.    Mr. Thornton was actually in possession of the card the

24 next day?

25 A.    Yes.

1  Q.    So there is a total of ten returns associated with this

2  card; is that right?

3  A.    Yes.

4  Q.    One successful refund and nine blocked?

5  A.    Correct.

6  Q.    Was any of the PII associated with those returns, that

7  was ten people's PII, found in the hotel room that day?

8  A.    All of them.

9  Q.    So PII for all ten of them was found?

10 A.    Correct.  Then the account opening documents for the

11 H&R Block card was also located in the hotel room.

12 Q.    Where Mr. Devlin was present on the 16th of August,

13 2012?

14 A.    Yes.

15 Q.    I would like to talk to you about the laptops.  How

16 many laptops were found in the hotel room that day?

17 A.    Three.

18 Q.    All right.  Was one an Acer laptop?

19 A.    Yes.

20 Q.    Was it forensically examined?

21 A.    It was.

22 Q.    And was there anything of evidentiary value found on

23 the laptop?

24 A.    There is at least 18 different identifiers located

25 under Tax Hawk software and other areas of the computer that

1  were found.

2  Q.    What is Tax Hawk?

3  A.    Tax Hawk is a tax filing software.

4  Q.    Of these 18 identifiers found on the computer under Tax

5  Hawk, was any of the PII from those people also found in the

6  hotel room?

7  A.    Yes.

8  Q.    All right.  Was there an HP Pavilion laptop?

9  A.    Yes.

10 Q.    Was that forensically examined?

11 A.    It was.

12 Q.    What was found on that?

13 A.    At least 26 different identifiers were located, again,

14 under Tax Hawk software, or in other areas of the computer.

15 Q.    And, again, you said 18 for the Acer, 26 for the HP.  I

16 assume these identifiers are not for Mr. Devlin,

17 Mr. Thornton, or the other two guys?

18 A.    Correct.

19 Q.    And was any of the PII associated with those 26

20 individuals found in the hotel room?

21 A.    It was.

22 Q.    And, then, finally, a Toshiba laptop?

23 A.    Can we go back to the HP for a second?

24 Q.    Yes.

25 A.    There was a photo of Mr. Devlin found on that computer.

```
 1   Q.    Okay.  So in addition to the 26 different identities

 2   that are not him, a picture of Mr. Devlin himself?

 3   A.    Yes.

 4   Q.    All right.  Was there a third laptop?

 5   A.    Yes, a Toshiba.  On that one there were nine different

 6   identifiers that were located also in Tax Hawk software and

 7   other areas of the computer.

 8   Q.    Was any of those nine identifiers/PII also found in the

 9   hotel room?

10   A.    Yes.

11   Q.    All right.  So you described to us some of the

12   documents that were recovered from the hotel rooms papers.

13   A.    Correct.

14   Q.    And were any documents that contained victims' PII

15   fingerprinted?

16   A.    Yes.

17   Q.    And did Mr. Devlin's fingerprints show up on any of

18   those records from the hotel room containing PII?

19   A.    Yes.

20   Q.    Can you describe that.

21   A.    There were three different pages in which Mr. Devlin's

22   fingerprints were found.  There were four fingerprints found

23   of Mr. Devlin.  And on those pages, there were -- one was of

24   a medical record, so it was, like, a medical run sheet that

25   had multiple identifiers on it.  But in total, of the three
```

1  pages, there are 33 different names, dates of birth, social

2  security numbers, or account numbers that were recovered.

3  Q.    On the page that Mr. Devlin handled at some point?

4  A.    Correct.  There was also the account -- or the card

5  ending in 5354.  That actual account number was found on one

6  of the pages in which his fingerprints were on.

7  Q.    Is that the H&R Block card that was found on

8  Mr. Thornton?

9  A.    Yes.

10 Q.    But used the day before by Mr. Devlin?

11 A.    Yes.

12 Q.    In addition to the information recovered from the hotel

13 room, did you research to determine whether there were any

14 debit cards issued in Mr. Devlin's own name?

15 A.    Yes.

16 Q.    What did you find?

17 A.    We found that there was an H&R Block card issued in his

18 name.  Hold on one second.  That card ended in 1604.

19 Q.    Do you know when it was opened or activated?

20 A.    In or around July of 2012.

21 Q.    Where was it mailed?

22 A.    It was mailed to 3422 Whittier Street, Apartment A,

23 which was Tyrone Devlin's address at the time.

24 Q.    After it was activated in July of 2012, were there any

25 tax refunds loaded onto that card in Mr. Devlin's name and

1    mailed to Mr. Devlin's address?

2    A.    Yes.

3    Q.    Can you describe those to us.

4    A.    Yes.  So on or about August 23, 2012, there was a

5    fraudulent tax return in the name of Arthur Curtis that was

6    electronically filed with the IRS.  The return claimed a

7    refund of $8,972.  The refund was electronically deposited

8    onto the card on September 12th, 2012.

9            Immediately after, again on September 12th of

10   2012, the card was used to make a total of $2,912 in

11   withdrawals at the same Bank of America ATM that he was

12   previously captured on video using, and that was located at

13   5002 East 10th Avenue in Tampa.

14   Q.    Was Mr. Curtis -- was that his name?

15   A.    Yes.

16   Q.    Was he identified or interviewed?

17   A.    He died.

18   Q.    Did he die before of after the refund was filed?

19   A.    I believe it was after the refund was filed.

20   Q.    You don't have the ability to interview dead people.

21   A.    No.

22   Q.    Maybe next time.

23           Was that the only one that was loaded onto

24   Mr. Devlin's card?

25   A.    No, it was not.

1    Q.    What happened next?

2    A.    On or about September 26, another fraudulent income tax

3   return was filed with the IRS in the name of Christopher

4   Wilbanks.   The return claimed a refund amount of 9,007.   On

5   or about October 17th, 2012, a tax refund in the amount of

6   $8,922.35, it was deposited onto the card, and the card

7   numbers have changed from 1604 to now 4719.

8        So then on October 17th, same day, the return was

9   deposited onto the card.   Again, at that same ATM on 10th

10   Avenue in Tampa, there was another withdrawal of 2,912 from

11   the Bank of America ATM.

12    Q.    Again, based on your experience of people committing

13   stolen identity refund fraud, is this consistent -- and by

14   this, I mean, as soon as the refund hits, making multiple ATM

15   withdrawals to get all the cash off the card?

16    A.    Yes.

17    Q.    All right.   In addition to these -- well, let me ask

18   you this:   Did you and the IRS determine that both of these

19   returns that were filed in these other people's names were

20   fraudulent returns?

21    A.    Yes.

22    Q.    And for the second one, Mr. Wilbanks, was he interviewed?

23    A.    He was.

24    Q.    What did he say?

25    A.    He said he's disabled and he doesn't file income tax

1  returns and he didn't authorize anybody to file this one or

2  receive the benefit.

3  Q.    In addition to these two refunds that were successfully

4  loaded onto Mr. Devlin's H&R Block card, did you or the IRS

5  determine whether any additional refunds were directed there

6  but blocked by the IRS?

7  A.    Yes.  There were an additional 15 returns that were

8  directed to the card but blocked by the IRS.

9  Q.    Were they all in names other than Devlin?

10  A.    Yes.

11  Q.    Were they all filed using the PII of identity theft

12  victims?

13  A.    Yes.

14  Q.    And were all the returns fraudulent?

15  A.    Yes.

16  Q.    Were any of these 15 people's PII found inside the

17  hotel room with Mr. Devlin in August of 2012?

18  A.    Yes.  There were seven different victims whose names

19  were filed that were found in the hotel room.

20  Q.    After the LaQuinta search in August of 2012 were there

21  any traffic stops involving Mr. Devlin that contained

22  evidence of his ongoing participation in stolen identity

23  refund fraud or identity theft crimes?

24  A.    Yes.

25  Q.    Was this one in March -- excuse me, November 25th of

1   2012?

2   A.     There was.

3   Q.     Can you just -- was it a traffic stop?

4   A.     It was a traffic stop.

5   Q.     And who was with him?

6          Are you referring now to the police report from

7   that?

8   A.     Yes, I am.

9          Jason Collins.

10  Q.     Why does it matter that Jason Collins was with him that

11  day?

12  A.     Because he was also found in the hotel room with him

13  back in August.

14  Q.     Were there any drugs found in the car or on Mr. Devlin?

15         MR. MAYBERRY:  Objection.  Relevance, Your Honor.

16         THE WITNESS:  Yes.

17         THE COURT:  Overruled.

18         MS. RIEDEL:  I would also just note for the record

19  that the rules of evidence don't apply in sentencing here.

20  BY MS. RIEDEL:

21  Q.     What drugs were found on Mr. Devlin that day?

22  A.     Marijuana and MDMA or ecstasy.

23  Q.     Was there evidence of tax fraud found in or around the

24  car of Mr. Devlin?

25  A.     Yes.

1  Q.    What was found?

2  A.    In the glove box there was an envelope with three

3  prepaid debit cards and mailers.  Two cards were Turbo Tax

4  Visa cards in the name of Carlene Hawley and Constance

5  Gagney, and there was one Netspend card in the name of Jason

6  Collins.  And, then, there was also a piece of paper that

7  listed 18 credit or debit card numbers, showing their

8  expiration dates and authentication numbers.

9  Q.    Was there another traffic stop in March of 2013?

10  A.    Yes.

11  Q.    Was Tyrone Devlin driving a car at the time of the

12  traffic stop?

13  A.    I believe so, yes.

14  Q.    Was there any drugs recovered?

15  A.    Yes.

16  Q.    What was recovered?  Drug paraphernalia also?

17  A.    There is marijuana, there was a grinder, there were

18  digital -- there was a digital scale.  Then there was also --

19  MDMA was found again.

20  Q.    Was there evidence of tax fraud found in or around

21  Mr. Devlin?

22  A.    Yes.

23  Q.    What was found?

24  A.    There were Green Dot cards that were found.

25  Q.    Green Dot cards, did you say?

1   A.    Yes.

2   Q.    All right.

3   A.    There were six Green Dot cards or prepaid debit cards

4   that were found.  One of them had Mr. Devlin's name on it.

5   Q.    Did you research what refunds were load onto these

6   cards?

7   A.    Yes.

8   Q.    What did you learn?

9   A.    So the card that had the name of Mr. Devlin on it had a

10  fraudulent tax refund that was directed to that card but was

11  blocked by the IRS.

12  Q.    And who was the name that that return was filed in?

13  A.    Anne Devlin.

14  Q.    Was Anne Devlin alive at the time that the return was

15  filed?

16  A.    No.

17  Q.    Was the return fraudulent?

18  A.    Yes.

19  Q.    In your experience, is it common for people committing

20  tax fraud -- or did it become increasingly common as the

21  years went on for people committing tax fraud to try to find

22  victims with names that were the same or similar to theirs to

23  load onto their cards?

24  A.    Yes.

25  Q.    Why is that?

1   A.    So there is a higher probability that the prepaid debit

2   card company wouldn't reject the return or that the IRS

3   wouldn't also reject the return.

4   Q.    Did you and other investigators meet with Mr. Devlin's

5   co-conspirator, Mr. Thornton?

6   A.    Yes.

7   Q.    Did he provide statements that corroborated your

8   investigation and Mr. Devlin's participation in the

9   conspiracy?

10  A.    Yes.

11  Q.    Can you just briefly outline some of the things that

12  Mr. Thornton said as to Mr. Devlin and his participation in

13  these crimes?

14  A.    Yes.  Mr. Thornton stated that he and Mr. Devlin grew

15  up together, that Mr. Thornton stated he rented the LaQuinta

16  hotel room in his brother's name.  So Mr. Thornton stated he

17  was in the hotel room by himself, and he had things that he

18  wanted from selling drugs.  So he stated that Mr. Collins and

19  Mr. Devlin approached him about getting cards to do

20  fraudulent tax refunds, and so they agreed to pay him

21  40 percent of the proceeds.

22          So Mr. Thornton stated the other three were all

23  doing the computer work and that he doesn't know how to work

24  the computer, that he didn't file the returns, but he got

25  proceeds from it or he would help get the cards.

1  Q.    "He" being Mr. Thornton?

2  A.    Yes.

3  Q.    Did Mr. Thornton say he saw Mr. Devlin electronically

4  file tax returns?

5  A.    Yes.

6  Q.    Did they share in the proceeds of the fraud?

7  A.    Yes.

8  Q.    Is there anything else you want to share that

9  Mr. Thornton said about Mr. Devlin?

10  A.    Not that I'm aware of.

11  Q.    In essence, did Mr. Thornton's statements corroborate

12  your investigation?

13  A.    Yes.

14  Q.    All right.  Did you prepare what's been marked by the

15  government as Exhibit 1 for purposes of the sentencing today?

16  A.    Yes.

17  Q.    Do you have a copy of it?

18  A.    I do.

19        MS. RIEDEL:  And I provided the Court with a copy

20  and defense counsel with a copy, as well as probation, in

21  advance.

22        THE COURT:  All right.

23  BY MS. RIEDEL:

24  Q.    What is Government's Exhibit 1?

25  A.    This is the loss calculation that I came up with based

1    upon information provided from the IRS service center.

2    Q.    All right.

3              MS. RIEDEL:  At this time, I offer Government's

4    Exhibit 1.

5              THE COURT:  All right.  Government's Exhibit 1 is

6    received into evidence.

7              (*Government Exhibit 1 received in evidence.*)

8    BY MS. RIEDEL:

9    Q.    Why don't you walk me through.  In cases like this, how

10   do you and your fellow investigators and IRS go about

11   determining loss?

12   A.    Okay.  So what we did in this case in particular is all

13   the names, dates of birth, social security numbers, as well

14   as the account numbers that were found in the hotel room were

15   sent to the IRS service center.

16   Q.    Just the hotel room or also Mr. Devlin's own debit cards?

17   A.    For this in particular, this was just the hotel room.

18   Q.    Okay.

19   A.    So that is sent to the IRS service center, and what

20   they do is they run all the 1600 identifiers through their

21   system to find fraudulent tax refunds, and they send us back

22   a spreadsheet with all the information in it, and this is a

23   trimmed-down version of what they sent to us.

24   Q.    When you and your colleagues first aggregated all of

25   the PII found in the hotel room and you sent it to the IRS --

1  A.    Yes.

2  Q.    -- did they identify fraudulent tax refunds that

3  resulted from that PII?

4  A.    Yes.

5  Q.    And what was the total of that amount?

6  A.    The total amount of attempted fraudulent tax refund was

7  over $6 million, and the actual money received was over

8  $2 million.

9  Q.    Based on that initial run by the IRS, did you then --

10  again, "you" being all of you, the investigators, take the

11  facts specific to this case and sort of narrow down the loss?

12  A.    Yes.

13  Q.    How did you do that?

14  A.    Basically by going back through the evidence, the

15  physical evidence found in the hotel room.  So on the

16  ledgers, when you have a name, date of birth, social security

17  number, you will have a dollar amount out to the side or an

18  e-mail address.

19        So the first thing that you do -- the first place

20  that we started actually was the H&R Block card, and you find

21  any other returns that were filed from the same IP address,

22  filed using the same account number, as well as the same

23  e-mail address.  Then you just kind of build it from there.

24  You get rid of anything that doesn't corroborate the

25  information found from the hotel room.

1    Q.    In this case, did you also narrow the dates?

2    A.    Yes.

3    Q.    And did you make sure that the dates conformed with the

4    dates of the conspiracy, meaning, again, the evidence from

5    the hotel room when they first started filing returns?

6    A.    Yes.

7    Q.    So, there were -- the search of the hotel room, when

8    was that, again?

9    A.    That was on August 16th of 2012.

10   Q.    And when does your loss calculation start?

11   A.    It starts May 1st, 2012.

12   Q.    So even if these people's PII was used before that, did

13   it get included in your loss?

14   A.    It was taken out.

15   Q.    All right.  Government's Exhibit 1, for each of the

16   lines of this exhibit, on the second column where it says

17   "name," what are these?

18   A.    Those are all the names of the victims.

19   Q.    Names of -- what does it mean to be a victim in this

20   case?

21   A.    Fraudulent tax refund return was filed in your name.

22   Q.    Are there more than ten victims?

23   A.    Yes.

24   Q.    How many are there?  Are there more than 400 victims?

25   A.    Yes.

1    Q.    All right.  For the intended loss, how did you come up

2    with the intended loss?

3    A.    So with the intended loss, I took all of the -- I took

4    everything that was on the spreadsheet which ties back to the

5    hotel room, and I took all the returns that were directed to

6    Mr. Devlin's card, and I took out any duplicates.  So you'll

7    have -- I have one number for what was specifically from the

8    hotel room and then what is not a duplicate that was directed

9    to Mr. Devlin's card, and I came up with the loss amount.

10   Q.    So you told us before there were seven people who had

11   returns filed on them that were directed to Mr. Devlin's card

12   and those people's PII were also found in the hotel room.

13   You didn't count that twice?

14   A.    Correct.

15   Q.    So for the intended loss, is that the amount of the

16   refund claim?

17   A.    Yes.

18   Q.    So the source of the refund claims, then, are filings,

19   fraudulent returns filed, using the PII in the hotel room?

20   A.    Yes.

21   Q.    Only from May 2012 to --

22   A.    This says August 15th, 2012.

23   Q.    So August.  It's a couple of months.  May, June, July,

24   and August in 2012?

25   A.    Yep.

1   Q.   As well as cards or returns with refunds directed to

2   Mr. Devlin's card?

3   A.   Yes.

4   Q.   So what was the total intended loss that you came up

5   with then?

6   A.   $2,567,696.

7   Q.   Is that the number in red, then, on the last page of

8   the exhibit?

9   A.   Yes.

10   Q.   And of those claims, was there a percentage that was

11   successful, meaning the IRS released the refunds and they

12   were loaded onto cards?

13   A.   Yes.

14   Q.   And is that the actual loss number?

15   A.   Yes.

16   Q.   What is the actual loss number that you came up with?

17   A.   435,499.

18          MS. RIEDEL:  I don't think I have anything else.

19   Thank you.

20          THE COURT:  Any cross-examination of this witness?

21          MR. MAYBERRY:  Yes, Your Honor.  Can I have one

22   second to just look at something in my notes?

23          THE COURT:  Of course.

24                    CROSS-EXAMINATION

25   BY MR. MAYBERRY:

1   Q.    Good morning, Detective.  How are you?

2   A.    Good morning.

3   Q.    Detective, you and I have met once before.  My name is

4   Jason Mayberry.  I represent Mr. Devlin.

5         You testified earlier that you are the case agent

6   on this case; correct?

7   A.    I'm one of them, yes.

8   Q.    Were you the lead case agent?

9   A.    Typically what we do is we all kind of work together.

10  Q.    Okay.

11  A.    So I wouldn't say there was one leader.

12  Q.    In your capacity as a case agent, is it safe to say you

13  have a pretty well global knowledge of what's going on with

14  the alleged conspiracy?

15  A.    Yes.

16  Q.    Okay.  You've drafted reports of your own?

17  A.    Yes.

18  Q.    Had an opportunity to review the reports that have been

19  submitted by other officers in this case?

20  A.    Yes.

21  Q.    Okay.  Have you had an opportunity to review the VA

22  Office of Inspector General reports through your course of

23  this?

24  A.    I believe the forensic reports, yes.

25  Q.    It would be -- I guess what I'm referring to would be

1   any fingerprint reports that Mack Brazelle would have done or

2   any reports generated or really anybody associated with the

3   VA.

4   A.    Again, I know that I've reviewed the computer findings;

5   and then I'm aware of the reports, but I haven't specifically

6   reviewed them.

7   Q.    Okay.  Detective, you are not currently a patrol

8   officer with TPD; is that correct?

9   A.    No.

10  Q.    You were not at the time of August 16th, 2012?

11  A.    No.

12  Q.    You were not one of the first officers on the scene at

13  the LaQuinta Inn as well; were you?

14  A.    No.

15  Q.    You were actually called into that case by officers

16  that responded initially to this incident scene; is that

17  correct?

18  A.    Other detectives were.

19  Q.    Okay.  Were there patrol officers initially responding

20  to this as well?

21  A.    I'm sorry?

22  Q.    Who were the first responding police officers?

23  A.    There were patrol officers that were there, and then

24  they contacted other detectives, not myself.

25  Q.    By the time you had gotten there, there had been other

1  police officers within the room that Mr. Devlin was found in;

2  correct?

3  A.    Again, I was never there.

4  Q.    You never actually went?

5  A.    No, sir.

6  Q.    So it's -- we will cut to the chase.  So you have no

7  idea what the condition of the room was, with your own eyes,

8  when the officers went in?

9  A.    No.

10 Q.    You would have to rely on what other officers

11 represented to you?

12 A.    Yes.  And the photos.

13 Q.    You can't say what other officers did prior to their

14 arrival based upon your own observations; correct?

15 A.    Right.

16 Q.    Okay.  So any testimony that you would have with

17 respect to where the PII would be in this room would be

18 relying upon what was represented to you by other law

19 enforcement officers?

20 A.    Yes.  And the photos.

21 Q.    Okay.  With that being said, Detective, you never

22 actually saw Mr. Devlin personally obtain any kind of PII

23 yourself; have you?

24 A.    Nope.

25 Q.    Never seen him obtain it from anyone?

1  A.     No.

2  Q.     You've never seen him then further supply it to any

3  other party; correct?

4  A.     No.

5  Q.     Never seen him share the personal identification

6  information with any other party?

7  A.     No.

8  Q.     In your time investigating this case or conversations

9  that perhaps any law enforcement officer would have had with

10  Mr. Devlin, there was never any representation by Mr. Devlin

11  of any kind of a cooperation agreement with any other person

12  in this case; was there?

13  A.     Not that I'm aware of.

14  Q.     Okay.  Any of the personal identification information

15  that was found within the room, I guess, would be considered

16  to be -- you know what constructive possession is as a law

17  enforcement officer; correct?

18  A.     Yes.

19  Q.     Okay.  That would be the case with the personal

20  identification information in the room as it relates to

21  Mr. Devlin?

22  A.     I think you are asking me two questions.

23  Q.     He didn't have it on his person, is what I'm asking.

24  A.     No.

25  Q.     One other person did, and that was Marquis Thornton?

1  A.    The H&R Block card, yes.

2  Q.    So he was never seen by law enforcement in possession

3  of any of the ledgers that Miss Riedel referenced; is that

4  correct?

5  A.    Not that I'm aware of.

6  Q.    Same question with respect to the notebooks.

7  A.    Not that I'm aware of.

8  Q.    And within the room that day, never saw him in any

9  actual possession of any debit or credit cards?

10  A.    You mean on his person or holding it?

11  Q.    Yes, ma'am.

12  A.    No.

13  Q.    There is no law enforcement officer that can come into

14  this courtroom, including yourself, and make any statement

15  claiming that they have seen Mr. Devlin file a tax return;

16  can they?

17  A.    No.

18  Q.    With respect to that -- so it's safe to say you can't

19  say for certain how many tax returns Mr. Devlin would

20  personally have filed on his own?  Well, back up.

21        No law enforcement officer can testify how many

22  tax returns Mr. Devlin filed?

23  A.    Not that I'm aware.

24  Q.    Has any law enforcement seen anyone within that room

25  file a tax return using the PII of another that was found

1   with them?

2   A.      Not that I'm aware.

3   Q.      You testified earlier, Detective, that the scope of

4   your intended loss range is from May 12th to --

5   A.      On the social security, the first date is May 1st, 2012.

6   Q.      To August 16th, 2012; correct?

7   A.      The last date on the spreadsheet is August 15th, 2012.

8   Q.      Okay.  There is no way for any law enforcement officer

9   to ascertain how long Mr. Devlin was in that hotel room?

10  A.      What do you mean?  How long it was rented for?

11  Q.      No one can come in and testify as to how many days

12  Mr. Devlin spent in that room.

13  A.      I guess not.  No.

14  Q.      Okay.  Outside of the fact he was found in there on

15  August 16, there is no evidence that can be proffered that

16  shows he was ever in there prior to that date?

17  A.      That's incorrect.  There was a video that he did pay

18  for a hotel room, so he is in the lobby around the same time.

19  Q.      But not in that room?

20  A.      Not specifically in that room, no.  But on the

21  property, yes.

22  Q.      Okay.  I'm just asking with respect to that room.

23  A.      Okay.

24  Q.      You had testified earlier that part of the testimony, I

25  guess, from you incorporated some of what Mr. Marquis

1  Thornton, who was the initial co-conspirator in this case --

2  what he had stated to law enforcement on February 23, 2018;

3  is that right?

4  A.    Yes.

5  Q.    You were present during that interview?

6  A.    For parts of it I was.  Then parts of it I had to leave

7  for another matter at the U.S. Attorney's Office.

8  Q.    Okay.  Ma'am, are you familiar with the statement,

9  though?

10  A.    I have briefly read over it.

11  Q.    Okay.  You've had an opportunity to read it?

12  A.    Again, I briefly skimmed over it.

13  Q.    Okay.

14  A.    So if there is a specific statement, just tell me what

15  page number you are referring to.

16  Q.    Mr. Thornton had referenced within this statement that

17  Mr. Devlin had just gotten out of prison and was still

18  figuring out the tax fraud scheme at the time of the hotel

19  incident, is that correct?

20  A.    What page of this is that on?

21  Q.    Of all the things you could jam me up on, Agent, you've

22  got me on where it is.

23        MR. MAYBERRY:  Your Honor, I apologize.  I have a

24  number of highlighting in here, and I'm looking for that.

25        THE COURT:  That's okay.

1   BY MR. MAYBERRY:

2   Q.    Detective, it would be on Page 6, first paragraph, last

3   sentence.

4   A.    Yes, that's what he said.

5   Q.    Within that statement, also, just above it, he had

6   referenced that he preferred to deal with Jason Collins

7   because he had more DDs, which is, parentheses, direct

8   deposits, than Devlin; is that correct?

9   A.    Yes.

10  Q.    Okay.  You would agree that a statement like that,

11  stating that he prefers to deal with one individual over

12  another, is implicit that each person would file their own

13  tax returns; would you not?

14  A.    Well, Thornton's role was to get the cards, so he would

15  get the cards so that the tax returns could be filed and

16  loaded onto the card he would provide.  So I don't know

17  exactly what you're asking.

18  Q.    I guess what I'm saying, he didn't reference in his

19  statement that he prefers to deal with these two acting in

20  concert.

21  A.    Meaning what exactly?  He would give cards to Devlin

22  and he would give cards to Collins.  He said he preferred to

23  deal with Collins because the returns would go through that

24  they would attempt to file.

25  Q.    Right.  He didn't indicate in any capacity that Collins

1   and Devlin were working together?

2   A.    I don't think we asked him that particular question.   I

3   don't know how to infer --

4   Q.    Okay.  And Mr. Thornton claims that the moneys were

5   shared after ultimately they were received; correct?

6   A.    Yes.

7   Q.    Claims that he would take 40 percent of whatever it was

8   that was returned?

9   A.    Yes.

10  Q.    Okay.  He also stated that his role in it was to

11  essentially pay his drug clients and homeless people to get

12  their identification to take back for use for the tax fraud;

13  is that correct?

14  A.    Do you have a page number?  That sounds about right.

15  Q.    I guess what I'm trying to figure out here, Detective,

16  is how would it make sense that Thornton would be necessary

17  in this case?  It seems to me like it would be reasonable for

18  someone who was doing this scheme to just go and find a

19  homeless person and do it themselves.

20  A.    In these schemes and the schemes that I have worked,

21  there are multiple different people that have multiple

22  different roles in filing fraudulent tax returns.  You have

23  people that file the returns, you have other people that go

24  in and recruit others to get their personal identifying

25  information, or they are also getting PII from them.

1          So specifically for the VA documents that were in

2     this case, those were obtained from a VA employee.  That guy

3     would trade the PII for drugs.  So you could have multiple

4     people that would a obtain the PII.

5          You have people that obtained the debit cards in

6     other people's names other than the victims' names that are

7     being obtained, and then you have to mail those cards

8     someplace.

9          So if I have an address -- if I have two

10    addresses, I have one for me and I have one for my mom, then

11    I can offer up my address to have cards mailed to my address,

12    the prepaid debit cards, in somebody else's name, and then I

13    can bring them to you or whoever is filing so that we can all

14    share in the proceeds.  So there are people that have

15    different roles.

16         Can somebody work by themselves?  Yes, but there

17    are people that have different roles and different -- just

18    different roles in a conspiracy.

19    Q.   Okay.  And these are just simply statements that were

20    made by Thornton in his meeting with you guys; correct?

21    A.   Yes.

22    Q.   You are aware of the fact that Mr. Thornton is a

23    convicted felon?

24    A.   Yes.

25    Q.   Has been a convicted felon for some time?

1   A.    Yes.

2   Q.    He's now a convicted felon for these frauds?

3   A.    Yes.

4   Q.    Certainly the incentive -- Mr. Thornton did not just

5   come and talk to you for free in any capacity; did he?

6   A.    I think he did it pursuant to the plea agreement.

7   Q.    Okay.  A plea agreement definitely gave him a

8   significant benefit; wouldn't you agree?

9   A.    I don't know what it says specifically and what he's

10  supposed to do.  That's more with what the attorneys deal

11  with.  I am told to show up when there is a proffer.

12  Q.    Well, Mr. Thornton, are you aware of the fact that he

13  had a Criminal History Category VI?

14  A.    I believe I learned that at his sentencing.

15  Q.    Okay.  And based upon his role in this conspiracy, he

16  would have been, I believe, a Total Offense Level of 23.

17              Are you aware of that?

18  A.    I don't know what any of that means.  Sorry.

19  Q.    Okay.  Would you believe me if I told you that he would

20  have faced -- his guideline, at a level 23, would have been

21  92 to 115 months?

22  A.    Okay.

23  Q.    Okay.

24  A.    I don't know.

25  Q.    He actually received 78 months on his sentence;

1   correct?

2   A.    I don't remember.

3   Q.    Okay.  If I had a document that stated that, would that

4   refresh your memory?

5   A.    Yes.

6         MS. RIEDEL:  We can concede that we believe you.

7   BY MR. MAYBERRY:

8   Q.    He actually pled to Counts One and Four in the

9   Indictment.

10  A.    Again, I guess.  I don't know.

11  Q.    Let me just ask you this, Detective.  Would you concede

12  to the fact that he received 78 months and that by entering

13  into that plea deal, he was capped at five years plus the

14  two-year consecutive term for aggravated identity theft?

15        MS. RIEDEL:  Yes, the government stipulates to

16  that.

17        MR. MAYBERRY:  Where I am going with this, Your

18  Honor -- you know where I'm going with it.

19        MS. RIEDEL:  She just doesn't know, but we are

20  happy to --

21        MR. MAYBERRY:  Okay.

22        THE COURT:  Fine.

23  BY MR. MAYBERRY:

24  Q.    You would agree, Detective, that would be a significant

25  incentive for someone to tell the government what they

1   thought they wanted to hear in order to get that benefit?

2   A.    I believe they worked out the benefit before he even

3   proffered.  I don't know where you are going.

4   Q.    Is there any video evidence of Mr. Devlin agreeing to

5   work jointly with anyone?

6   A.    No.

7   Q.    Any audio evidence of that?

8   A.    Nope.

9   Q.    Any statements from Mr. Devlin that he was working

10  jointly with anyone?

11  A.    Not that I'm aware.

12  Q.    Outside of Marquis Thornton, is there anyone that's

13  ever made a claim that Mr. Devlin was working jointly with

14  anyone?

15  A.    Not that I'm aware of.

16  Q.    There were a total of four people within this room when

17  Mr. Devlin was found within it; correct?

18  A.    Yes.

19  Q.    One of them was named Jason Collins?

20  A.    Yes.

21  Q.    The other individual's name is Nathan Fagan?

22  A.    Yes.

23  Q.    Those two are unindicted; correct?

24  A.    Yes.

25  Q.    There was a number of fingerprints and a number of

1    other information that tied them in with this alleged

2    conspiracy; correct?

3    A.    Yes.

4    Q.    Okay.  These were individuals that had prior felonies,

5    prior crimes of dishonesty?

6    A.    I didn't look up their criminal records.

7    Q.    Okay.  You had referenced Tyrone Devlin's card, the

8    1604.  You referenced that because it had his name on it; is

9    that correct?

10   A.    Yes.

11   Q.    Do you have any evidence outside of his name and the

12   address of who actually opened that card?

13   A.    No.

14   Q.    You mentioned earlier that within the schemes people

15   have certain roles and they can give addresses and do

16   different things.

17          It's conceivable that someone else within this

18   room could have opened the card in his name with his address;

19   is it not?

20   A.    They would need his social security number and date of

21   birth to be able to open up a prepaid debit card in

22   Mr. Devlin's name.

23   Q.    Sounds like they had quite a few dates of birth and

24   social security numbers.

25   A.    Not his.  His was not recovered from the room.

1  Q.   You can't say somebody didn't get it at any time before

2  this?

3  A.   He could have provided it to them.

4  Q.   They could have gotten it through other means?

5  A.   I guess it's possible.

6  Q.   That card wasn't on his person?

7  A.   No.

8  Q.   Marquis Thornton had a card that ended in 9477 that,

9  actually, I believe had his name on it; is that right?

10  A.   Yes.

11  Q.   Okay.  As far as who loaded that card, can you say who

12  loaded that card?

13  A.   In Marquis Thornton's name?  No.

14  Q.   You can't say who loaded Mr. Devlin's card either; can

15  you?

16  A.   No.

17  Q.   Okay.  Do you suspect that all the parties that were

18  within that room were involved in a tax fraud?

19  A.   I do.

20  Q.   There was another card that was found on Marquis

21  Thornton that ended in 5354.  That was actually found on

22  Mr. Thornton's person; correct?

23  A.   Yes.

24  Q.   And, ma'am, he admitted that card was his?

25  A.   I believe that's what he told law enforcement.

1 Q. Okay. And this is the card that was alleged to have

2 been used at a Bank of America ATM where Mr. Devlin was

3 alleged to have withdrawn the funds?

4 A. Yes.

5 Q. In the course of daily life, it's not necessarily

6 uncommon for somebody to go through an ATM and a passenger

7 hand them their card and ask them to withdraw funds; is it?

8 A. I would not say that's a function of everyday life, no.

9 Q. But people do it?

10 A. I'm not -- I don't do it. So I can only speak for me.

11 Q. Good enough.

12      You had referenced before that there was cash

13 found on Mr. Devlin.

14 A. Yes.

15 Q. Was that cash traceable?

16 A. No.

17 Q. Okay. Was it marked with anything?

18 A. I don't know.

19 Q. Okay. You can't say positively where that cash came

20 from?

21 A. No.

22 Q. Okay. There was also a number of fingerprints --

23 excuse me for one second.

24      Several items within the room were tested for

25 fingerprints?

1   A.    Yes, there was a sampling of fingerprints done from the

2   items in the room.

3   Q.    Okay.  There was -- are you familiar with the report

4   from fingerprint tech Candida Gauthier's report?

5   A.    I'm familiar with reviewing it at some point, yes.

6   Q.    Are you familiar with the fact she received 69 items to

7   test for fingerprints on April 4, '16?

8   A.    Are you reading from a report?

9   Q.    No.  Am I reading from the report?

10  A.    Yes.

11  Q.    No.  I just know it.

12  A.    If I had the report in front of me -- I didn't print

13  that one out and bring it with me today.

14  Q.    Would you agree with me if I told you that?

15  A.    I was the one who took the sampling out, and I took a

16  sampling of the documents out and provided them to our crime

17  lab to process for latent prints.

18  Q.    Okay.  In total, there was 191 items that were tested

19  by the Tampa Police Department for fingerprints from the

20  LaQuinta Inn?

21  A.    I don't know the exact number, but there were documents

22  that were tested.

23  Q.    Okay.  Would you agree with me of those items, Tyrone

24  Devlin, Marquis Thornton, Nathan Fagan, and Jason Collins'

25  prints were all used as comparison samples?

1   A.     Yes.

2   Q.     Then that means that Miss Gauthier was looking to see

3   if any of the prints found on the documents matched up with

4   any of the individuals I just referenced?

5   A.     She's not the one that actually does the comparison.

6   She just processes, and then a latent print examiner is the

7   one who actually compares.

8   Q.     Mr. Gonzalez?

9   A.     Yes.

10   Q.     Nonetheless, they were test samples to use as

11   comparisons; correct?

12   A.     So what we provide to them are the OBTS numbers, and

13   then they -- I don't know how they do it.  I don't know how

14   their system works, but they look at the prints and determine

15   who they come back to.  And if needed, I believe they

16   actually pull the actual print to compare, if it's a partial

17   or something to that degree.

18   Q.     Okay.  Would you agree there were only two items of

19   that initial testing that were thought to match Mr. Devlin?

20   A.     I don't know about how many were from the initial.  I

21   know there were a total of four.

22   Q.     All right.  For argument sake, if there were two from

23   that initial testing, that could leave 189 items that did not

24   have Mr. Devlin's prints on them?

25   A.     If that's what the report says.

1   Q.    Okay.  Are you familiar with the fact that through the

2   course of that testing there were 12 other people besides

3   Mr. Devlin that had fingerprints on some of that PII?

4   A.    I know there were other people, yes.

5   Q.    In fact, Mr. Collins' prints were actually found on

6   seven -- seven times, on seven items?

7   A.    Again, I don't have the report in front of me, but his

8   fingerprints were found, as well as Mr. Fagan's.

9   Q.    Are you familiar with the testing that was done on May

10  3rd of 2017?

11  A.    Again, I believe another sampling was given.  I don't

12  have the report in front of me to actually look at it, so I

13  apologize.

14  Q.    Agent, you are aware of the computers being tested for

15  fingerprints; correct?

16  A.    I believe the VA tested those for fingerprints.

17  Q.    Not a single one of -- not a single computer had Tyrone

18  Devlin's fingerprints on it; correct?

19  A.    That's correct.

20  Q.    Of those computers -- going back to Mr. Thornton, there

21  was a blue Acer computer within that room?

22  A.    Yes.

23  Q.    Okay.  That blue Acer computer was originally claimed

24  by Marquis Thornton; was it not?

25  A.    Yes.

1   Q.    And then ultimately he filled out a disclaimer form,

2   likely when it got a little sticky for him when the police

3   were talking to him; is that correct?

4   A.    He filled out a disclaimer saying it wasn't his.

5   Q.    So he initially claimed it and then he disclaimed it?

6   A.    Yes.

7   Q.    Later, when he was interviewed by a series of agents in

8   this case on February 23, '18, he tells you all he doesn't

9   even know how to use a computer; is that correct?

10  A.    Yes.

11  Q.    So he's made some inconsistent statements with respect

12  to ownership and use of the computer.  Would you agree?

13  A.    Yeah.

14  Q.    Are you familiar with a gentleman named Mack Brazelle?

15  A.    No.

16  Q.    Are you familiar with the forensic science laboratory

17  of the United States Treasury, Office of Inspector General,

18  doing a fingerprint analysis on some of the things within

19  this room?

20  A.    I believe that's the VA process.

21  Q.    Any fingerprinting that would have been done would have

22  been done on the part of the Veterans Affairs; is that right?

23  A.    Yes.

24  Q.    Do you have any familiarity with the documents that

25  they tested, which was primarily the VA medical documents,

1    using a baseline print for Jason Collins, Tyrone Devlin,

2    Nathan Fagan, and Marquis Thornton and another guy named

3    David Lewis as comparison samples?  Are you aware of that?

4    A.    I know that I provided them with some of the VA

5    documents that were recovered and then they processed them.

6    Q.    Okay.  On that testing within the VA documents, are you

7    familiar with how many fingerprints were yielded?

8    A.    No, I'm not.

9    Q.    If I said 211, would you believe me?

10   A.    I just don't know.  I don't have the report.

11   Q.    All right.  Of the entire 211 prints that were taken

12   from the VA documents, would you agree, Detective, that only

13   one print came back to Tyrone Devlin?

14   A.    I don't know.  I don't even recall looking at this

15   document, so I can't testify to that because I haven't seen

16   it.

17   Q.    It's possible within the course of daily activity to

18   get fingerprints on anything that you've touched.  You would

19   agree with that; correct?

20   A.    Yes.

21   Q.    I probably have fingerprints all over this page here

22   (indicating)?

23   A.    Yes.

24   Q.    Yet, I have not -- I'm not committing a fraud by

25   touching or holding or moving that document?

1   A.    If it has PII on it, you might be committing fraud.

2   Q.    I can assure you it does not.

3   A.    Okay, then.

4   Q.    Where I'm going with this, Detective, it's possible

5   that Mr. Devlin could have simply just moved this

6   documentation and got his fingerprints on it without having

7   any ill-intent of using it, much less using it in concert

8   with someone else?

9   A.    It depends, because for all the documents that were

10  found, they were labeled where they were found.  I took a

11  sampling at the top, the middle, and the bottom.  So it would

12  just depend where specifically in the stack of stuff that was

13  found.  There was stuff that was in bags that I specifically

14  took out of bags.  So it would just depend.

15          If it was laying on the dresser, then, possibly.

16  But if it was buried deep inside something, you know -- then,

17  is there a chance he could have touched it and not had

18  anything to do with it if it's in a drawer or bag or

19  something like that?  I would say no.

20  Q.    The traffic stop on 11-25 of '12, Jason Collins was

21  with Mr. Devlin?

22  A.    Yes.

23  Q.    The PII that was found was within the glove box of that

24  vehicle; correct?

25  A.    Yes.

1  Q.    Accompanying that PII was a card in the name of Jason

2  Collins; correct?

3  A.    Yes.

4  Q.    So given that this was not on Mr. Devlin's person, it

5  is just as likely that could have belonged to Jason Collins;

6  correct?

7  A.    It was also in Mr. Devlin's car; and being in the glove

8  box, it could have belonged to either one of them.

9  Q.    That's where I'm going.  It could have belonged to

10  either individual in the vehicle; right?

11  A.    Yes.

12          THE COURT:  Mr. Mayberry, as I said at sidebar, I

13  have a bar event that I had committed to and I need to leave

14  in the next few minutes for that.  We can resume this -- I

15  think I would be back by 3 o'clock.

16          Is everybody available at 3 o'clock?  Do you have

17  something, Miss Riedel?

18          MS. RIEDEL:  Yes, I have a hearing at 3:30 before

19  Judge Tuite and I have a meeting at 2:30 that I can,

20  obviously, cancel.  But I'm available all day tomorrow if

21  that works.

22          THE COURT:  I could.  I don't know exactly when,

23  though.  How long is your hearing in front of Judge Tuite?

24          MS. RIEDEL:  I can also try to find coverage for

25  it if you prefer.  Why don't you just set this and I'll work

1   around it over lunch.

2          THE COURT:  Are you available this afternoon,

3   Mr. Mayberry, at 3 o'clock?

4          MR. MAYBERRY:  Yes, Your Honor.  I believe so.

5   Let me look to make sure.  If I'm not, I can make it.

6          THE COURT:  I appreciate that.  Thank you.  We are

7   going to resume this at 3 o'clock, exactly where you are.

8   You haven't finished your -- normally I would have liked to

9   finish, but I'm not going to rush you through.

10          MR. MAYBERRY:  I don't think I have too terribly

11   much more.

12          THE COURT:  Whatever it is, it's fine.  We will

13   resume at 3 o'clock.  Okay.  Thank you very much.  I

14   appreciate it.

15          We are in recess.

16          (Recess taken from 11:36 a.m. to 3:06 p.m.)

17          COURT SECURITY OFFICER:  All rise.

18          This Honorable Court is now in session.

19          THE COURT:  Thank you.  Thank you for coming back.

20          We were in the middle of your cross-examination,

21   Mr. Mayberry, I believe.  So I'll remind the witness, you are

22   still under oath.  Do you understand that?

23          THE WITNESS:  Yes, ma'am.

24          THE COURT:  Go ahead, Mr. Mayberry.

25          MR. MAYBERRY:  Thank you, Your Honor.

1              CROSS-EXAMINATION (resumed)

2   BY MR. MAYBERRY:

3   Q.    Aside from Marquis Thornton, there was no other

4   eyewitness to these events that can testify that the men were

5   working jointly when they filed these tax returns; is that

6   correct?

7   A.    Yes.

8   Q.    Law enforcement can't say who was present when each of

9   these tax returns were filed; can they?

10  A.    No.

11  Q.    They can't say for sure who filed each one?

12  A.    No.

13  Q.    They can't say for sure that individuals were working

14  in concert when each one was filed?

15  A.    I don't know what that means.

16  Q.    They were working together when each one was filed.

17  Let me restate the question.

18            Law enforcement doesn't have -- law enforcement

19  can't say that they have evidence that individuals were

20  working as, say, a tag team on each tax filing that was filed?

21  A.    I guess that's a hard question because law enforcement

22  charged them with working together in a conspiracy.  So they

23  were charged with that based upon our findings in the

24  entirety of the investigation.

25  Q.    I guess I'll rephrase the question.

1           Outside of what Marquis Thornton has stated, there

2  is no other witness that saw two individuals working

3  together, filing these tax returns?

4  A.    You are saying can law enforcement say that they saw

5  two people on a computer, filing returns?

6  Q.    Correct.

7  A.    No, law enforcement can't say they saw two people

8  filing returns on a computer.

9  Q.    You answered my question.

10          You can't say that each participant didn't file

11  their own fraudulent returns individually; can you?

12  A.    Meaning what?  In their own name?

13          THE COURT:  You need to restate it.  That's a

14  double negative and it's hard to understand.  If you can just

15  state it again, please.

16  BY MR. MAYBERRY:

17  Q.    You have no eyewitness that can say that each time a

18  return was filed that there were two or more people working

19  toward filing that return?

20  A.    Meaning how?  No one was sitting in the room with them

21  while they were doing it?

22  Q.    Correct.  You have no eyewitness that can tell you that

23  there were two people working on each return that was filed.

24  A.    Besides Marquis Thornton?

25  Q.    Correct.

1   A.    There is no eyewitness saying they were sitting in the
2   room with them while they were filing.
3   Q.    There were a number of debit cards that were found in
4   the room.  There were no fingerprints of Tyrone Devlin on any
5   of those debit cards; were there?
6   A.    The debit cards weren't processed for latent prints
7   that I remember.  There may have been one.  Let me take that
8   back.  There may have been one that was dusted for
9   fingerprints, but none of the other ones were actually
10  processed.  It's a different processing mechanism for paper
11  as opposed to plastic.
12  Q.    But, I guess, to that end, you are saying law
13  enforcement did not test the cards or they only tested one?
14  A.    I believe there was only one that was attached to a
15  mailer that was actually processed because it's a different
16  processing mechanism.  You dip paper into a liquid and you
17  actually use, like, the powder on plastic.
18  Q.    Do you have any idea why law enforcement didn't test
19  those cards?
20  A.    I did the sampling, and I tested all the paper.
21  Q.    Okay.  But not the cards?
22  A.    No.
23  Q.    Okay.  Of the ledgers that were in the room, do you
24  know how far back those dated?
25  A.    Meaning the spiral notebooks full of PII?

1   Q.    Yes.

2   A.    What do you mean how far back?

3   Q.    Were they dated?  Was there anything in there that gave

4   an indication as to when they were received or when they

5   were --

6   A.    They were notebooks full of PII.

7   Q.    I guess maybe the better question is, do you know when

8   they were created?

9   A.    No.

10  Q.    Okay.  That's it.  Thank you for your time.  That's all

11  that I have for you.

12              THE COURT:  Thank you.  Any redirect for this

13  witness?

14              MS. RIEDEL:  No, Your Honor.

15              THE COURT:  The witness can go back to counsel

16  table.  Thank you.

17              Do you have another witness, Miss Riedel?

18              MS. RIEDEL:  No, Your Honor, just argument.

19              THE COURT:  All right.  Anything that you would

20  like to present, Mr. Mayberry, in terms of witnesses or

21  anything like that?

22              MR. MAYBERRY:  Mr. Devlin would like to testify,

23  Your Honor.

24              THE COURT:  Okay.  Very good.  Mr. Devlin, please

25  come forward.  We will swear you in, sir.

1    THE COURTROOM DEPUTY:  Please raise your right

2  hand.

3    Do you solemnly swear or affirm under penalty of

4  perjury that the testimony you shall give in this cause will

5  be the truth, the whole truth, and nothing but the truth?

6    THE DEFENDANT:  Yes, ma'am.

7    THE COURTROOM DEPUTY:  Thank you.

8    MR. MAYBERRY:  May it please the Court?

9    THE COURT:  You may proceed, Mr. Mayberry.

10    TYRONE DEVLIN,

11  having been first duly sworn by the Courtroom Deputy,

12  testified as follows:

13    DIRECT EXAMINATION

14  BY MR. MAYBERRY:

15  Q.    Sir, state your name and spell it for the record.

16  A.    Tyrone Devlin; T-y-r-o-n-e, D-e-v-l-i-n.

17  Q.    Mr. Devlin, are you the same Tyrone Devlin that is a

18  defendant in this case that we are here on today?

19  A.    Yes, sir.

20  Q.    Okay.  You are here for a number of -- you've pled to a

21  number of counts; conspiracy, access device fraud, theft of

22  government funds and then, ultimately, aggravated identity

23  theft.

24    Could you tell the Court what your role

25  specifically was in these crimes.

1   A.    Yes, sir.  One day while I was in the neighborhood

2   where I growed up at --

3   Q.    What was that neighborhood?

4   A.    Temple Park.  Well, it's not Temple Park no more,

5   but -- it's Temple Park now.  A friend that I know approached

6   me and told me -- asked me would I take him to Hillsborough.

7   He was going to pay me gas money.  When he got in the car and

8   I took him to Hillsborough, I wound up taking him to an H&R

9   Block.  I asked him what he was doing going there.  He told

10  me he was going to get him a block, which is short for H&R

11  Block.

12  Q.    He told you he was going to do what?

13  A.    He's going to go in there and get a block.  Block is

14  short for H&R Block.  When he came back out, I said, that was

15  that easy?  What you figurin' to do with it?  He said, I am

16  going to have somebody load it up for me.

17  Q.    What does loaded up mean?

18  A.    Loaded up means he let somebody put a false tax return

19  on it.

20  Q.    Okay.

21  A.    A fraudulent tax return.

22  Q.    Did he tell you who he was going to have put the tax

23  return on the card?

24  A.    Did he tell me?

25  Q.    Yes.

1   A.     No, he didn't tell me.

2          Can I finish?

3   Q.     Sure.

4   A.     Once he told me that, I decided to go get me one.  When

5   I got my card, my plan was to let somebody load it up for me.

6   Q.     When you say your card, you are referring to the card

7   with your name on it that was referenced earlier?

8   A.     Yes, sir.

9   Q.     When did you get that card?

10  A.     Um, probably the first or second week of July.  First,

11  second.  I don't know exactly.  It's been six years ago.

12  Q.     Okay.  Once you got that card, what did you do?

13  A.     I hold it for a little bit, maybe a couple of days,

14  until I find somebody who could load it up for me.  That's

15  when I met somebody who I know named Redman.

16  Q.     Do you know what Redman's actual name is?

17  A.     Antwon Bealon (phon).

18          MS. RIEDEL:  I'm sorry.  Who?

19          THE DEFENDANT:  Antwon Bealon.

20          When I seen him, I asked him was he swinging.

21  Swinging means is he putting them in.  Is he getting, you

22  know, drops, what they call drops.

23  BY MR. MAYBERRY:

24  Q.     Is he loading cards with fraudulent tax returns; is

25  that what you mean?

1    A.    Right.  I asked him -- I told him I was messed up.  My

2    money was gone.  Would he load my money for me.

3    Q.    What was messed up?

4    A.    I was broke.  I didn't have money.  I was struggling.

5    I needed money.  I needed some help.  I asked him would he

6    load up my card for me.  He told me yeah.  I gave him my bank

7    account information, and I waited.

8    Q.    When did you put the money on there; do you remember?

9    A.    It had to be instantly.  It took maybe a couple of

10   weeks.

11   Q.    Did you actually have to physically give him the card

12   to do that?

13   A.    No.

14   Q.    Okay.  He just knew the information from the card and

15   was able to process it?

16   A.    Yes.

17   Q.    Did you know how many attempts he made?

18   A.    Not exactly.

19   Q.    Did he give you any insight as to that?

20   A.    No.  He just would tell me if he's going to come or not.

21   Q.    If he was going to come get the money?

22   A.    If the money was going to come.

23   Q.    How much money do you think you received on that card?

24   A.    I actually received $1500.

25   Q.    On that first occasion?

1 A. What you mean?

2 Q. Well, how many times did money get loaded on that card?

3 A. Based off the police report that I read, money got

4 loaded on the card twice.

5 Q. Okay.  And what year was this?

6 A. 2012.

7 Q. Were you using any drugs or alcohol at the time?

8 A. Yes, sir.

9 Q. What were you using?

10 A. Mollys.  Weed.  Xanax bars.  Prescription drugs.

11 Q. Opiates?

12 A. Yes, sir.

13 Q. Do you feel like you had a drug problem?

14 A. Yes, sir.

15 Q. Okay.  So you had the card and Antwon Bealon was

16 loading the card.  During the incident that we are here on,

17 the August 16th, 2012, entry to the LaQuinta Inn, you were in

18 that room; correct?

19 A. Yes, sir.

20 Q. Okay.  Any of that information within that room, was

21 any of that used to your knowledge by Antwon Beilon to load

22 anything with your card?

23 A. Excuse me?

24 Q. When you were in the room, the information that was in

25 the room with you -- you said that Antwon Bealon was loading

1  the card that you had.

2  A.    Yes, sir.

3  Q.    Do you know if he used any of that information to load

4  your card?

5  A.    I would assume he did because he left a book bag there.

6  Q.    Okay.  Did you know the process that he went through to

7  load it?

8  A.    I guess he would just file the name and direct it to

9  the card.

10  Q.    Did you ever help him do that?

11  A.    No, sir.

12  Q.    You supplied him with the card and he did it?

13  A.    Yes, sir.

14  Q.    There was an incident in November of 2012 where you are

15  with Jason Collins and got pulled over, and Detective

16  Canfield testified there was a number of pieces of PII, some

17  cards, and I believe a card that belonged to Jason Collins.

18  Do you recall that?

19  A.    Yes, sir.

20  Q.    Okay.  Were you in your vehicle?

21  A.    Yes, sir.

22  Q.    Were you driving?

23  A.    Yes, sir.

24  Q.    Where was Jason Collins within the vehicle?

25  A.    In the passenger seat.

1  Q.    The information that was in the glove box, do you

2  remember if that was yours, or do you remember whose that was?

3  A.    I know it wasn't mine.

4  Q.    Do you know whose it was?

5  A.    It was Collins'.  He had to put it in there.

6  Q.    There was also an incident in March of 2013 where you

7  were pulled over and officers found a number of Green Dot

8  cards, in addition to -- I believe, there was a piece of

9  paper within -- a piece of paper that I believe was in a

10  wallet and also two iPads and a Gateway computer.

11          Was that yours?

12  A.    Yes, the cards was mine.

13  Q.    What about the computers and iPads?

14  A.    The iPad was mine.  One of the computers was actually

15  broken down.  It didn't work.  It was in the trunk of the car.

16  Q.    Was that used to file tax return fraud on?

17  A.    Yes.

18  Q.    Okay.  Is there anything else that you would like to

19  tell the Court?

20  A.    Um, when you were asking me those questions, you kind

21  of, like, took it farther than where I was going before I

22  could finish.

23  Q.    Correct me.

24  A.    Okay.  I provided the card to load up.  Before money

25  can ever actually fall on the card, I became impatient,

1    waiting on it to come.  So I sold him the card.  That's how I

2    received the $1500 that I said I got.  This happened probably

3    a couple of days before the police actually caught us in that

4    room.

5    Q.    Okay.

6    A.    Now, that's the reason I said I didn't know how much

7    money had got put on a card because I no longer possessed the

8    card, to know, because I had sold it to him, the money.

9              Do you see what I'm saying?

10   Q.    I understand.

11   A.    Like, the money that was put on there, it was put on

12   there after I had sold it to him.  So I wouldn't know if he

13   had received any amount of money or not.

14   Q.    So you knowingly sold your information to him --

15   A.    Yes, sir.

16   Q.    -- knowing that he would very likely continue to load

17   that card?

18   A.    Yes, sir.

19   Q.    Okay.  Anything else?

20   A.    No, sir.

21              MR. MAYBERRY:  That's all that I have, Your Honor.

22              THE COURT:  Okay.  Any cross-examination?

23              MS. RIEDEL:  Yes, Your Honor.

24                        CROSS-EXAMINATION

25   BY MS. RIEDEL:

1   Q.    Mr. Devlin, we haven't met.  My name is Amanda Riedel.

2   I took over your case when the prosecutor before me moved

3   away.  I just want to get a couple of things clear.

4             The card you are referring to that you sold to

5   Redman, that was your H&R Block card?

6   A.    Yes, ma'am.

7   Q.    The one ending in 1604?

8   A.    I guess that's the ending digit of it.

9   Q.    Your only role, as far as you sit here today, was you

10  got an H&R Block card; right?

11  A.    Yes, I got H&R Block card.

12  Q.    And that H&R Block card was sent to your house?

13  A.    Yes.  It was mailed to the address that was on the card.

14  Q.    Where you stay?

15  A.    Well, that was my mailing address.

16  Q.    It was mailed to your mailing address?

17  A.    Yes.

18  Q.    And you knew that the card was going to be used to

19  receive tax refunds?

20  A.    Yes.

21  Q.    And you knew that those tax refunds didn't belong to

22  you?

23  A.    Yes.

24  Q.    And you knew they would be filed in other people's

25  names without their permission or knowledge?

1    A.    Yes.

2    Q.    And you agreed to do that with this person Redman?

3    A.    Yes.

4    Q.    But before any of that money hit the card, you grew

5    impatient?

6    A.    Yes.

7    Q.    And so you just sold him the card for $1500?

8    A.    Yes.

9    Q.    And that is the sum total of your involvement in the

10   stolen identity refund fraud?

11   A.    No.

12   Q.    No?

13   A.    No.

14   Q.    Okay.  I must have missed the part where you admitted

15   to doing other things.

16   A.    No, he just never asked me, or I never talked about

17   doing other things.

18   Q.    Okay.  So let me just ask you that.  The day you were

19   in the LaQuinta room, had you ever been in there before?

20   A.    I can't recall.  But I know that they was living in

21   that room before I ever went in the room.  Like, they had

22   been living in that room previously.  Before.  I can't recall

23   ever being inside the room, but I could recall actually

24   dropping them off to the room.

25   Q.    As I sat there and listened, I thought what you were

1  trying to say, you had nothing to do with the filing of tax

2  returns, with any of the PII or information found in that

3  room; is that right?

4  A.     I never filed any tax return.

5  Q.     Did you ever receive any refunds or try to receive any

6  refunds resulting from the filing of tax returns from the PII

7  in that room?

8  A.     Do you mean besides the refunds that was going to be

9  directed to the H&R Block card?

10 Q.     Yes.  You said you got rid of that.  You got bored.

11 A.     I'm asking you -- you said did I ever receive any.

12 Q.     Did you ever receive or try to receive any money from

13 the PII that was found in that room?

14 A.     Other than the H&R Block card?  Like some other kind of

15 way?  Did I ever try to receive or receive money?

16 Q.     Right.

17 A.     No.

18 Q.     Okay.  So you had nothing to do with the PII in that

19 room?

20 A.     No.

21 Q.     And you didn't help acquire it or use it in any way?

22 A.     No.

23 Q.     And you never filed any tax returns using the PII in

24 that room?

25 A.     No.

1   Q.    And you never got any refunds -- you personally --

2   because, remember, you said you just sold the card.

3   A.    Right.

4   Q.    You never got any money off of any refunds?

5   A.    I did.

6   Q.    Oh, you did.  What did you do?

7   A.    Okay.  Thornton asked me did I want to make some money.

8   I said, yeah.  What do you want me to do?  Take me to get the

9   money off the card.  I took Thornton to go get the money off

10  the card.  When we got to the ATM, I was thinking he was

11  going to go to the ATM to get the money off the card.  When

12  we got there, he handed it to me.

13  Q.    That's the other card that you are on video, taking

14  money out the day before the LaQuinta search?

15  A.    Yes, that's the card that Thornton had.  That belonged

16  to Thornton that I was at the ATM using.

17  Q.    So the only thing you are sitting here today admitting

18  to is what the government produced to you, that video?

19  A.    I'm admitting that I was in that video and I took the

20  2900 off that ATM, and I'm admitting that I provided Antwon

21  Bealon with the H&R Block card for him to load up.

22  Q.    So based on what you are saying, then, your

23  fingerprints on the PII is a coincidence?

24  A.    Actually, it is.

25  Q.    And your picture on the computer that Mr. Thornton said

1    that was yours is a coincidence?

2    A.    I don't recall ever anything saying anything about a

3    picture.  I recall saying something about a Facebook page.

4    Q.    Okay.  So if your picture appeared on a laptop computer

5    found in the room, that would just be, again --

6    A.    If it was from a Facebook page, that could be --

7    somebody could have been looking at my Facebook or somebody

8    could have been on my account or streaming on social media.

9    Q.    And the fact that there were cards sent to you that

10   were loaded with tax returns at or around the same time,

11   including right after you activated it, all of that wasn't

12   your doing?  That was somebody else?

13   A.    You said card that was sent to me.  What cards?

14   Q.    The H&R Block card that was sent to you.

15   A.    Say what you just said again.

16   Q.    The H&R Block card that was sent to you.

17   A.    Say what you said before.  Complete the whole sentence

18   over again so I can understand what you just said.

19   Q.    I'll tell you what I tell my children, which is to say

20   please.

21         What I'm asking is, is it your testimony today

22   that of those returns that were directed -- and let me get

23   my -- okay.  There is the H&R Block card in your came ending

24   in 1604; right?  Is that the one?

25   A.    Yeah.

1  Q.    So you activated it -- you said that was in July of

2  2012?

3  A.    I think.  First week or the second week.

4  Q.    Okay.  So there were refunds directed to it starting

5  almost right away, starting July 17th, 2012, and continuing

6  until October 25th, 2012.  Is it your testimony that you

7  didn't have anything to do with the filing of those returns?

8  A.    No, I didn't file neither one of those returns.

9  Q.    There are 15 of them.

10  A.    Right.  I didn't file neither one of those returns, but

11  my whole anticipation of getting the card was so that someone

12  can put a return on it.  I'm not disputing that.

13  Q.    And then these people that you say you had nothing to

14  do with that were in the hotel room -- Jason Collins was in

15  the hotel room; right?

16  A.    Yes, ma'am.

17  Q.    And you were stopped with him two months later, in

18  November; right?

19  A.    You just said these people that you was in the room

20  with that you said I had nothing to do with?

21  Q.    I'm saying, is it your testimony that you did not file

22  tax returns or commit identity theft crimes with the people

23  in the room at the LaQuinta?

24  A.    No.

25  Q.    You did not?

1  A.    I didn't file no tax returns.

2  Q.    Or get any money?

3  A.    I received money from Redman.

4  Q.    But he's not in the room.  I don't know who Redman is.

5  A.    I'm saying -- I'm telling you what I did get the money

6  from.  I received the money from Redman for purchasing the

7  card and I received the money from Thornton for going and

8  taking the money off the card.

9  Q.    Okay.  So you're not admitting that you ever did

10 anything with Jason Collins related to the filing of

11 fraudulent tax returns or receiving tax refunds?

12 A.    In that room?  I'm asking you.

13 Q.    Ever.

14 A.    Because there was times that we got pulled over with

15 each other again.  I'm trying to make sure you are talking

16 about in that room or some other time.

17 Q.    Well, ever.  I'm trying to figure out whether you

18 knowingly entered into an agreement with the people you pled

19 guilty to being in a criminal agreement with.

20 A.    Only person I pled guilty to being in a criminal

21 agreement with was Marquis Thornton, and that agreement was

22 to go take money off the debit card.  That's the only

23 agreement him and me ever had with each other.

24 Q.    The indictment alleged that you entered into a

25 conspiracy that started in May of 2012.  You pled open to the

```
1  indictment.  That means that you swore under oath that you
2  committed that crime.
3          Did you swear under oath at your change of plea
4  hearing?  Did you swear to tell the truth?
5  A.    Yes.
6  Q.    And did you swear that you committed the crime of
7  conspiracy -- which you don't get to make up your own
8  conspiracy, right?  It's not pick your own conspiracy.  The
9  conspiracy you pleaded guilty to was conspiring with
10 Mr. Thornton and others, including Mr. Collins, to commit tax
11 fraud, starting in May of 2012.
12          Do you remember that?
13 A.    Yes, I remember pleading guilty to that.
14 Q.    Okay.  And you were under oath that day?
15 A.    Yes.
16 Q.    And you are under oath today?
17 A.    Yes.
18 Q.    But today you are telling us, no, the only thing you
19 pled to was that one time you went to the ATM with
20 Mr. Thornton?
21 A.    When I pled guilty, the magistrate judge asked me
22 exactly what I did so that he would be able to find that
23 there was a factual basis to enter that guilty plea.  When it
24 came to the conspiracy, the actual conspiracy, he asked me
25 what did I do to conspire.  I told him I took Jason --
```

1    Marquis Thornton to the ATM to get money off the card.

2    That's how I conspired.  He asked me did I know that the

3    money on the card was stolen.  I told him yeah.  That was my

4    involvement with conspiring.

5            Whatever happened in May was something I don't

6    know anything about.  I wasn't even involved -- I wasn't even

7    involved in May.  There is nothing -- no one ever showed --

8    not in the discovery, not in Marquis' testimony, nowhere does

9    it says that I was involved with them prior to -- in anything

10   else before what I actually did with them.

11   Q.    Which the only thing you are saying you did with them

12   was go to one ATM, using one card with Marquis Thornton one

13   time?

14   A.    With Thornton.

15   Q.    Right.  That's the conspiracy?

16   A.    Right.

17   Q.    Redman is not in the conspiracy?

18   A.    No one else is in the conspiracy.  Only Thornton is in

19   the conspiracy.

20   Q.    The last thing I want to ask you about, for your adult

21   life, you have earned money by stealing; right?

22   A.    Yes.

23   Q.    You break into cars?

24   A.    Yes, break into cars.

25   Q.    You steal stuff out of people's cars?

1  A.    Yes.

2  Q.    Checkbooks out of people's cars?

3  A.    Probably.  Whatever is found in the car.  Probably I

4  would take it, or something like that.

5  Q.    And you've lied to the police before; right?

6  A.    Excuse me?

7  Q.    You've lied to the police before?

8  A.    I don't really ever talk to them when I do get

9  arrested.  I just go on about my business.  I exercise my

10 right to remain silent.

11          MS. RIEDEL:  I have nothing else.  Thank you, Your

12 Honor.

13          THE COURT:  Okay.  Any redirect, Mr. Mayberry?

14          MR. MAYBERRY:  No, Your Honor.

15          THE COURT:  All right.  The witness is excused.

16 You can go back to counsel table there, Mr. Devlin.

17          All right.  You said you had some arguments you

18 wish to make, Miss Riedel?

19          MS. RIEDEL:  Yes, Your Honor.

20          THE COURT:  You may proceed.

21          MS. RIEDEL:  Your Honor, the way that I see it --

22 and I could be wrong, but the defendant pleaded guilty, sort

23 of.

24          THE COURT:  Not just sort of.  He pled guilty.

25          MS. RIEDEL:  He definitely pled guilty.  Although,

1   today I feel like we have walked some of that back.  So the

2   question becomes --

3              THE COURT:  Well, when you plead guilty in front

4   of the magistrate judge, the magistrate judge accepts that

5   plea, that's it, unless there is something very, very

6   unusual, such as, you were under coercion that you didn't

7   admit or you were under some mental impairment or drugs or

8   something along those lines.  But, as you know, we have a

9   pretty good colloquy that tends to make it very difficult to

10  withdraw a plea.

11             MS. RIEDEL:  I think that's right, and I think

12  that -- I just think we are in a little bit of a different

13  place than --

14             THE COURT:  I agree.

15             MS. RIEDEL:  -- than we were then.

16             THE COURT:  I agree.

17             MS. RIEDEL:  I'm not at all suggesting that the

18  defendant didn't make a knowing and voluntarily plea, because

19  he did.  I think we are hearing something that's a little

20  more exaggerated today.

21             THE COURT:  I don't dispute your analysis.

22             MS. RIEDEL:  As the Court knows, and just for

23  Mr. Devlin's benefit, we are not here for the government to

24  prove beyond a reasonable doubt that the crime was committed.

25  He swore under oath that every single crime in the indictment

1  was committed, including the conspiracy.

2  　　　　　The burden then lessens, so the government now has

3  a burden of showing by a preponderance those facts that

4  support the guidelines and the guidelines calculation.

5  　　　　　Again, the important thing to remember here is

6  that for purposes of loss, the Court also has a different job

7  than if they were at a trial determining someone's guilt

8  beyond a reasonable doubt.  As the guidelines direct, the

9  Court need only make a reasonable estimate of the loss.

10 　　　　　This estimate can be based on available

11 information, taking into account factors.  The fair market

12 value of the property, which are not here.  But in this case,

13 it's not hard to determine what the loss is.  It's the

14 claims.  The question is what was Mr. Devlin's role.

15 　　　　　We heard from two witnesses.  This is a

16 circumstantial case.  Every single document case tends to be

17 circumstantial.  In the world of filing false tax returns

18 five years ago, we don't have 24-hour surveillance that

19 watches everyone filing tax returns and doing all their bad

20 work.

21 　　　　　I think the government has established facts that

22 support the guidelines calculation.  Here we have individuals

23 that were found in a hotel room together.  They were found

24 with PII strewn about the room that was open and obvious.

25 Mr. Devlin's fingerprints were found on four separate pages

1  of that PII, including the VA medical records that contained

2  multiple individuals' means of identification.

3          He benefited from those tax returns.  He was found

4  with $2600 in cash in his pocket, with no other source of

5  income.  He was found connected to the laptops.  Again, his

6  picture on the laptop, and Marquis Thornton said that one of

7  the laptops was his that was found in the room.

8          After this date, he was found with one of the

9  co-conspirators, Mr. Collins, in a traffic stop, possessing

10  more debit cards.  Yet another traffic stop where he had more

11  debit cards.  He had an H&R Block card in his own name mailed

12  to his mailing address that was loaded with two tax returns,

13  but multiple others were directed to it.

14          The bottom line is that the government has

15  established that Mr. Devlin by a preponderance of the

16  evidence knowingly participated in this conspiracy.  And

17  what's important is that the PII for these debit cards and

18  for these returns that were directed to debit cards under his

19  control and in his possession were found in the hotel room

20  that day.  So there is a direct link not just through the

21  physical evidence like the fingerprints, but in tracing the

22  PII and how it was used back to him.

23          I do believe the government has met its burden.  I

24  don't think anything Mr. Devlin says credibly undermines the

25  factual presentation.  I also think that the Court can

1   consider whether Mr. Devlin today has truly and fully

2   accepted responsibility.  If not in terms of the actual

3   guideline calculation, but in terms of 3553 factors.

4           THE COURT:  The problem for Mr. Devlin is you

5   can't have your cake and eat it, too.  And that really is one

6   of the concerns that I have, because while it is -- you

7   certainly have the right to make challenges in sentencing

8   hearings.  We do that on a not-infrequent basis.  It does

9   come up.

10          But the problem is here, it seems to go a bit

11  beyond that.  I am disinclined to take away the points for

12  acceptance of responsibility.  I would let them stay.  I

13  think he had -- what was it?  Three levels.  I think that's

14  what you get.

15          MS. RIEDEL:  Yes, I agree, Your Honor.  Actually,

16  probation and I had this conversation ahead of time, which

17  even in light of the filing of the objections, I was not in

18  favor of taking away acceptance.

19          But in this case, I do think that it's not just in

20  terms of guideline application, but in the application of the

21  3553 factors that we can talk about in a minute.

22          But in terms of the objections to the factual

23  findings and the guidelines in the PSR, I would respectfully

24  move this Court that those objections be denied.  I think the

25  government has more than met its burden, and there is no

1    credible evidence to the contrary.

2           THE COURT:  Okay.  Let me hear an argument from

3    Mr. Mayberry in response.  Mr. Mayberry.

4           MR. MAYBERRY:  Yes, Your Honor.

5           THE COURT:  In essence, what she's said is there

6    is circumstantial evidence, particularly when you look at the

7    hotel room and the PII that was found in the room, the

8    fingerprints, the medical records, the $2600 in cash, shows a

9    direct link.  And particularly with the lesser burden of

10   preponderance of the evidence as opposed to beyond a

11   reasonable doubt, that the government has met its burden.

12   That's it in a nutshell of what she said.

13          MR. MAYBERRY:  Right.  Your Honor, my argument

14   essentially within the commentary of the relevant conduct is

15   1(b)1.3, I believe it is.  Principles and limits of

16   sentencing accountability under the guideline are not always

17   the same as the principles and limits of criminal liability.

18          So while he has pled and gone in under the

19   conspiracy, the crux of our argument was the conduct that was

20   undertaken by Mr. Devlin in terms of attempted filings,

21   attempted tax fraud was done not in concert with the whole of

22   who was in that room.

23          What we are trying to do is limit the intended

24   loss attributable to him because I don't believe that this

25   was something where it would be a tax fraud code where

1    everyone goes in and shares information and works in concert

2    and works together.  It seems to me like this would be a

3    situation where there would be a supply of this and then

4    folks would go in and take it and attempt these tax fraud

5    filings.  If it was successful, great, it went to them.  If

6    it wasn't, move on to the next one.

7            So that's essentially the crux of the argument.  I

8    just don't think, Your Honor, that the activity of the filing

9    and the hope to benefit was jointly undertaken.  I think it

10   was an individual effort.

11           There is a -- there was an application note within

12   1(b)1.3.  It's under (C)(4), and this is an example.  The

13   example given, it's only the theme that I think follows

14   through with my argument.  This example is given where there

15   is an individual that's a wholesale distributor of child

16   pornography.  Again, Your Honor, the facts of this are

17   nothing related to this.

18           Defendant L is a retail dealer who purchases this

19   from the supplier and then is resold.  Similarly, Defendant M

20   is a retail-level dealer who purchases child pornography from

21   Defendant K and resells it, but otherwise operates

22   independently of Defendant K.  Defendants L and M are aware

23   of each other's criminal activity but operate independently.

24   Ultimately, Defendant N is listed as Defendant K's assistant.

25           Moving down, all the way down, Defendant L is the

1   one that I would focus on for purposes of this.  It says

2   Defendant L is accountable under Subsection (a)(1)(A) only

3   for the quantity of child pornography that he purchased from

4   Defendant K because he's not engaged in a jointly undertaken

5   criminal activity with the other defendants.  For the same

6   reason, Defendant M is accountable under Subsection (a)(1)(A)

7   only for the quantity of child pornography that he purchased

8   from Defendant K.

9          There are other examples where the supplier has an

10  assistant and that assistant would be ultimately responsible

11  for the entirety of it.  In this example, there was a person

12  that obtained this child pornography and then distributed it

13  independent of what that supplier did or knew about.

14         In this case, I think that it can run congruent to

15  this example because I think this stuff that was in there was

16  sought after by these individuals and used for their benefit

17  and it wasn't something -- in spite of what Mr. Thornton

18  said, who did get a tremendous benefit for his role and who

19  really sits in not that dissimilar of a position

20  credibility-wise to Mr. Devlin, I just don't think it's been

21  shown through testimony that there is anything, outside of

22  him, that shows that this was jointly undertaken.

23         I understand that the stuff was in the room, but I

24  just don't see where they have shown a link that all of the

25  four individuals that were found in the room or any of the

1  other twelve or thirteen who had fingerprints distributed

2  amongst the PII were working in any kind of concert as if

3  this were a quasi-legitimate business endeavor.

4       So that's the reason for my argument that I think

5  Mr. Devlin certainly is going to have some intended loss

6  amount upon him, but I don't think that it has been shown

7  that he should be held responsible for the entirety of what's

8  within there.  That's the crux of my argument.

9       THE COURT:  Okay.  Thank you, Mr. Mayberry.

10      I am going to overrule your objection.  I think

11 that the government has submitted sufficient evidence here

12 during the course of this hearing to show or to verify that

13 the probation officer correctly scored this.

14      So as noted by the probation officer in the

15 addendum, under the provisions of Section 1(b)1.3, relevant

16 conduct, a defendant is accountable for all acts and

17 omissions committed, aided, abetted, counseled, commanded,

18 induced, procured, or willfully caused by the defendant; and

19 in the case of jointly undertaking criminal activity, all

20 reasonably foreseeable acts and omissions of others in

21 furtherance of the jointly undertaken criminal activity that

22 occurred during the commission of the offense of conviction

23 in preparation for the offense or in the course of attempting

24 to avoid detection or responsibility for that offense.

25      As noted by the probation officer, each and every

1    act of the defendant and his co-conspirators that is factored

2    into the intended loss calculation is properly done and

3    supported by the provisions of relevant conduct, pursuant to

4    Section 1(b)1.3.

5           There is most certainly evidence that on numerous

6    occasions from May 2012 to June 2013 the defendant and his

7    co-conspirators jointly undertook activities in furtherance

8    of the scheme or plan.  And here they obtained debit cards

9    and are registered in their own and other people's names and

10   directed that the debit cards be loaded with fraudulently

11   obtained tax returns and they withdrew the fraud proceeds

12   using these debit cards.

13          As I pointed out earlier, there is most certainly

14   circumstantial evidence.  The hotel room, the personal

15   identification information found in the room, the

16   fingerprints, medical records in the room, the $2600 in cash.

17   That's a direct link.  So most certainly I believe that it's

18   a reasonable estimate of the loss as determined by the

19   probation officer.

20          The defendant and his co-defendant and

21   co-conspirators worked together to file fraudulent tax

22   returns that, if fully paid out by the IRS, intended to cause

23   total pecuniary harm to the IRS in amount of $2,567,696.

24          Probation correctly used this intended loss in

25   completing their guideline calculation.  The objection is

1    noted but overruled.

2          I think I may need a little bit more additional

3    argument with respect to the number of victims.  That was his

4    other objection with respect to paragraph 13 through, 20, 29,

5    the enhancements for the number of victims.

6          Do you have anything to add to that?

7          MS. RIEDEL:  Yes, Your Honor.  As demonstrated in

8    Government's Exhibit 1, each and every one of those

9    individuals who had their PII used to file fraudulent tax

10   returns is a separate and unique victim, whether they are

11   deceased or alive at the time of the filing.

12         In addition, every single individual's PII that

13   was used to open a debit card account without their knowledge

14   or permission is a separate victim.  That spreadsheet alone

15   contains more than 400 victims.  The defendant had more than

16   10 individuals' PII used to file returns just for the debit

17   cards sent in his name to his own house.

18         I think the law is also clear that the victim

19   enhancement applies not only for your specific acts but, in a

20   conspiracy, for those of your conspirators as well.  So I

21   think the government -- and I did try to bring that out with

22   Miss Canfield.  There is factual evidence to support the

23   victim enhancements.

24         THE COURT:  Thank you, Miss Riedel.

25         Mr. Mayberry, do you wish to respond to that,

1    because I have Government's Exhibit No. 1 that Miss Riedel

2    tells me has over 400 names?

3            MR. MAYBERRY:  Right.  Your Honor, the same

4    argument for this would be what we argued with respect to --

5            THE COURT:  Yes, sir.  That objection is noted but

6    overruled.  I think that the government has more than met its

7    burden with respect to this enhancement.  So that objection

8    is overruled.

9            Any other objections as to the factual accuracy or

10   to the probation officer's application of the guidelines,

11   Mr. Mayberry?

12           MR. MAYBERRY:  Your Honor, we had cited an

13   objection to 29D with respect to the offense that involved an

14   unauthorized transfer or use of a means of identification

15   unlawfully to produce or obtain by any other means.

16           I had within my memorandum cited *United States*

17   *versus Jean Baptiste Charles* for the premise that the

18   imposition of a two-level sentencing increase for trafficking

19   in unauthorized access devices and for a defendant convicted

20   of conspiracy to use unauthorized access devices was not

21   proper on the basis of defendant's transfer of fraudulent

22   debit cards to his accomplice where the defendant was also

23   convicted of aggravated identity theft.

24           Our argument, Your Honor, is based on the *Jean*

25   *Baptiste Charles* case.  Essentially that this is an improper

1    increase of the offense level based on the fact that he's

2    already charged with aggravated identity theft, and so he

3    shouldn't be subject to the two-level increase.

4         THE COURT:  Okay.  Let me hear a response from the

5    government.  Miss Riedel.

6         MS. RIEDEL:  Your Honor, in this case -- and this

7    is an enhancement that I believe is applied routinely in

8    these cases because in order to fraudulently file tax

9    returns, it's more than just the debit card number.  You have

10   several different means of ID.  You have names, dates of

11   birth, social security number of a tax filer.  You have a

12   unique ID that is assigned by the IRS, and those are

13   transferred and shared in this case, as well as the debit

14   cards.

15        I think they are appropriately applied and I think

16   consistently applied in these types of cases because we found

17   not -- you sort of have two sides of it.  You have the filing

18   and then the receipt.  So he's charged with the aggravated

19   identity theft for the debit card, for using a debit card in

20   somebody else's name, but that doesn't account for the

21   transfer, possession, and use and trafficking in of the PII

22   on the front end to file it by him and his co-conspirators.

23        THE COURT:  All right.  Based on that, I'm going

24   to overrule the objection.  This has been appropriately

25   scored for the reasons outlined by the probation officer in

1  paragraph D, as well as the additional information provided

2  by the government today.

3          Any other objections?

4          MR. MAYBERRY:  That's all that I had noted,

5  Your Honor.

6          THE COURT:  All right.  The Court adopts the

7  undisputed factual statements and guideline applications

8  contained in the presentence report.  As to the controverted

9  factual statements and guideline applications, the Court

10  adopts the position of the probation office as stated in the

11  addendum.  Therefore the Court determines that the advisory

12  guidelines are:

13          Total Offense Level 23, Criminal History Category

14  VI, 92 to 115 months' imprisonment as to Counts One, Two, and

15  Three, two years consecutive to all other counts; one to

16  three years as to Counts One, Two, and Three, one year as to

17  Count Four of supervised release.  Restitution is $435,499.

18          Is that your final figure there, Miss Campbell?

19  You've had the opportunity to analyze that?  Because I know

20  previously it might have been something different, and we

21  also have a forfeiture order here I think for 26,000, if I'm

22  not mistaken.

23          MS. RIEDEL:  Yes.  The distinction being -- and

24  Miss Canfield testified to the actual loss, which is the

25  restitution amount.  The distinction for the forfeiture is

1   now, given the new law, they only go after the forfeiture

2   amount for the refund claim for the specific count for this

3   defendant.

4          THE COURT:  That's why it's 26,000 as opposed to

5   what it would have been a few years ago.

6          MS. RIEDEL:  Yes, Your Honor.

7          THE COURT:  All right.  Anything to add to that?

8          THE PROBATION OFFICER:  No, Your Honor.

9          THE COURT:  $435,499.  10,000 to a hundred

10  thousand dollar fine and a $400 special assessment.

11         Miss Riedel, anybody here to speak on behalf of

12  any victims or victim agencies?

13         MS. RIEDEL:  No, Your Honor.

14         THE COURT:  All right.  Anything you would like to

15  say on behalf of the victim agencies?

16         MS. RIEDEL:  Just briefly, Your Honor.

17         Obviously these cases are investigated frequently

18  by the IRS.  We have a VA agent here as well, and that's

19  because there were VA employees or contractors stealing the

20  PII of our veterans.  Some of that PII in the form of medical

21  records was found in this hotel room, and one page contained

22  Mr. Devlin's fingerprints.  So the victimization in this

23  case -- I mean, it's layers upon layers of tragedy; but in

24  this case, you had bad actors.  I think in this case it was a

25  shredder, a shredding company.  No, I'm sorry.  You had a VA

1    employee.  And, unfortunately, I've had more than one of

2    these, so I got confused initially.  A VA employee who would

3    steal the PII and sell it on the street as a commodity, in

4    this case, in exchange for narcotics.

5          THE COURT:  I've had a case like that a few years

6    ago where a VA employee stole that, and I had a veteran who

7    came in and testified and how he felt that he had been

8    victimized very significantly.

9          MS. RIEDEL:  This is the case, Your Honor.  That

10   man that you had was the source of the PII for the VA medical

11   records found in the hotel room with Mr. Devlin.

12         THE COURT:  I still remember, and that was a few

13   years ago.  It just has an impact on you when you see

14   somebody who's been injured significantly and then comes in

15   really traumatized by what's happened again.  They are

16   already fragile as it is.  And you do something like this to

17   them, it makes it even worse.

18         MS. RIEDEL:  What happens, Your Honor, the PII

19   never goes away.  It never expires, so it gets copied,

20   scanned, texted, and traded on the street again, and the

21   people are victimized year after year.  If it's not for the

22   tax returns, it's credit cards because their social security

23   numbers and birth dates and names stay the same.

24         THE COURT:  Well, that's why the penalties are

25   significant.  These are significant penalties.

1          All right.  Do you know of any reason why this

2    Court should not now proceed with imposition of sentence,

3    Miss Riedel?

4          MS. RIEDEL:  No, Your Honor.

5          THE COURT:  This is your opportunity to make a

6    statement with respect to what an appropriate sentence for

7    Mr. Devlin would be.

8          I know that we have the mandatory two-year

9    consecutive; and under the guidelines, with respect to Counts

10   One, Two, and Three, it's 92 to 115 months.

11         MS. RIEDEL:  Yes, Your Honor.

12         The Court is aware of the standard statement that

13   I make in all of these cases -- it's no less important

14   here -- about the fact that the Tampa Bay area has been and

15   continues to be ravaged by identify theft crimes.  Here we

16   have a chart with over 400 victims that were just represented

17   on one given day in a hotel room.

18         These people suffered not only financial harm but

19   emotional harm as a result of this, basically because it was

20   quick and easy money.  Here we have an individual who was not

21   only present that day and participating, but continued to

22   violate the law as evidenced by the information recovered

23   from those traffic stops in the months following.  I think

24   that, to me, sends an important signal about the nature and

25   characteristics of this defendant.

1              He is a Criminal History Category VI; and I think

2    that for all of the other crimes that he's committed in the

3    past, they did not significantly deter him, nor did having

4    the police search the hotel room and take all your stuff.  So

5    I think a significant term of incarceration is necessary but

6    not greater -- is appropriate but not greater than necessary

7    in this case to reflect the seriousness of the harm.

8              The full scope -- this was a lot of stuff.  Three

9    computers, tons of PII, medical records from the VA.  It's a

10   great deal of money.  It's a scheme that happened over an

11   extended period of time.  Summer 2012, May, June, July,

12   August, he kept doing it.  September, October, and into March

13   of the next year, based on those traffic stops.

14             I think that the defendant's own personal

15   characteristics, particularly his criminal history, show that

16   a guideline sentence, of course, is appropriate.  While I

17   normally ask for the low end of the guidelines, I don't think

18   low end is appropriate here.  So I would be asking for 98

19   months as to the guideline counts, which is six months higher

20   than the low end, followed by the mandatory 24 months

21   consecutive, and that would result in a term of incarceration

22   of 122 months total.

23             THE COURT:  How about -- I know he has served some

24   time.  I'm not positive what that situation is with respect

25   to the state court.  Are you asking for concurrent time with

1    the term of imprisonment pursuant to the cases in

2    Hillsborough County Circuit Court?

3              MS. RIEDEL:  No.

4              THE COURT:  I'm not certain if he's served that

5    time yet.  Do you know?

6              MS. RIEDEL:  He is serving the sentence right now.

7    That's why he's on a writ over here, because he was

8    sentenced.  That conduct had nothing to do with this stolen

9    identity tax refund.  He is not -- the government obviously

10   is not entitled or required to make any promises to him

11   because he didn't enter into a written agreement.

12             Normally when we look at concurrent time we are

13   looking at a situation where it's either part of the same

14   general nature, it's about the same time, or about the same

15   type of events.  These are completely separate and distinct

16   events.

17             THE COURT:  What makes them separate and distinct?

18             MS. RIEDEL:  Let me refer to his criminal history.

19             THE COURT:  Do you know how long of a sentence

20   he -- Mr. Mayberry, do you happen to know?

21             MR. MAYBERRY:  Your Honor, yes.  It's ten years.

22             THE COURT:  Ten years, okay.

23             MR. MAYBERRY:  I put some of that information in

24   my sentencing memorandum as well.

25             THE COURT:  Okay.  So he's going to serve that ten

1   years first.

2             MS. RIEDEL:  Is that the --

3             THE COURT:  Miss Campbell, are you at all familiar

4   with this situation?

5             THE PROBATION OFFICER:  Nothing other than what's

6   in the presentence report on Page 19.  Nothing further, Your

7   Honor.

8             MS. RIEDEL:  Sorry.  I mean, over on the one side,

9   in our case, you've got a sophisticated financial crime

10  involving the theft of documents and filing tax returns.

11  This is a physical property crime, a burglary crime.  I don't

12  have any information that it's the same people or same type

13  of crime, and it's not at the same time.  It's three years

14  later.

15            I would point out that in 2012, when he's

16  committing the offenses for which we are here today, he just

17  had gotten out of prison.  I think he got out of jail in

18  February, before this started in the summer of 2012.  He was

19  certainly on some kind of probation or supervision.  It

20  didn't matter.  None of it mattered.

21            THE COURT:  He's going to be in prison for a long

22  time because he's probably only served a few years of that

23  2015 charge, right?

24            MS. RIEDEL:  Yes, Your Honor.  Presumably three

25  years.  He's got seven left.

1              THE COURT:  Seven left.  And then here, if I go to

2    the bottom of the guidelines, it's still nine years or so.

3              MS. RIEDEL:  Yes, Your Honor.  I have nothing

4    further.

5              THE COURT:  All right.  So your position is that

6    it should be consecutive to the defendant's term of

7    imprisonment with respect to those three state cases,

8    correct?

9              MS. RIEDEL:  Yes, Your Honor.

10             THE COURT:  Because it has nothing to do with it.

11             MS. RIEDEL:  Literally nothing.  Three years

12   later, not the same nature of the crime, not the same place,

13   not the same time, not the same people.

14             THE COURT:  Okay.  All right.  Well, I'll hear

15   from the defendant, then.  Mr. Mayberry, do you know of any

16   reason why this Court should not now proceed with imposition

17   of sentence?

18             MR. MAYBERRY:  No, Your Honor.

19             THE COURT:  All right.  This is your opportunity

20   to make a statement, present any information in mitigation of

21   the sentence.  And, Mr. Devlin, you have the right to address

22   the Court directly.  You don't have to, but I wanted to make

23   certain that you understand that you have that right.

24             Do you understand that, Mr. Devlin?

25             THE DEFENDANT:  Yes, ma'am.

1          THE COURT:  Okay.  Go ahead, Mr. Mayberry, please.

2          MR. MAYBERRY:  Your Honor, first of all, thank you

3    for allowing us to make argument on the objections.

4          THE COURT:  Sure.

5          MR. MAYBERRY:  Your Honor has had the opportunity

6    to read my memorandum.

7          THE COURT:  I just refreshed my memory on it.  I

8    looked at it previously and I looked at it again.

9          MR. MAYBERRY:  I'm sure Your Honor could glean

10   from literally one of the very first things that I put in

11   here was a citation to 18 U.S.C. 3584(a).  Unfortunately in

12   this line of work, especially with CJA cases, I'm dealing far

13   too often with men who are writted out of state custody to

14   over here and are subjected to undischarged terms of prison,

15   be it in another federal case or state cases.

16          It always makes it much more complicated for the

17   defense.  And when it's a white collar case like this, it's

18   just compounding him.

19          This case did, in fact, predate what Mr. Devlin is

20   in custody for currently.  He has done, I believe, three

21   years of that term.

22          Under 18 U.S.C. 3584, if multiple terms of

23   imprisonment are imposed on a defendant at the same time, or

24   if a term of imprisonment is imposed on a defendant who was

25   already subject to an undischarged term of imprisonment,

1   which is what we have here, the statute states that the terms

2   may run concurrently or consecutively.

3           Multiple terms of imprisonment imposed at the same

4   time are presumed to run concurrently unless the Court orders

5   otherwise or the statute mandates that the terms are to run

6   consecutively.  In this situation, multiple terms of

7   imprisonment imposed at different times run consecutively

8   unless the Court orders the terms are to run concurrently.

9           THE COURT:  I think I have the discretion one way

10  or the other.

11          MR. MAYBERRY:  Yes, Your Honor.

12          THE COURT:  I mean, obviously what the Bureau of

13  Prisons does is up to them, but I think I have a certain

14  level of discretion here.

15          MR. MAYBERRY:  I've taken a significant amount of

16  my argument straight from Henry Sadowski, who is, if I

17  remember correctly, a lawyer for the Bureau of Prisons, and

18  he specialize -- he actually does treatises and whatnot on

19  this very situation.

20          So, essentially, in practice, Your Honor, I would

21  ask you to review this issue under 3553(a) because I think

22  that's the mandate to the courts in their analysis of that.

23  And, then, ultimately, it would just be stated on the record

24  and memorialized within the judgment of sentence if it's to

25  run concurrent or consecutive.  If it's to run concurrent

1    it's mandated that the state institution would be the primary

2    custodian.

3            THE COURT:  It's pretty significant here because

4    this isn't a one-year state sentence.  It's a ten-year state

5    sentence.  And it's a tough call, Mr. Mayberry.  I'm going to

6    tell you why.  Because I think your client is receiving a

7    significant sentence.  There is just no two ways about it.

8    He's receiving a significant sentence.  There is the

9    mandatory two-year consecutive sentence, and I understand all

10   that.  The other side of it is that it's a totally separate

11   crime.

12           MR. MAYBERRY:  I understand.

13           THE COURT:  It's sort of like when I get a

14   revocation of supervised release and a new crime and I'm

15   asked by the defense attorney to have it be concurrent as

16   opposed to consecutive.

17           Well, that's sort of like you're not punished for

18   the violation of supervised release.  And here, that's why I

19   asked the prosecutor are these different or the same because

20   if it was for the same crime or at least somewhat related to

21   it -- it doesn't have to be exactly the same, but at least

22   related -- I'm going to err on the side of giving your client

23   the benefit of the doubt, but here it's completely separate.

24           MR. MAYBERRY:  I understand.

25           THE COURT:  How do you get around that he's being

1  punished for that?  If I make it anything other than

2  consecutive, how is he being punished appropriately for both

3  crimes?  Quite frankly, to me, this is the biggest issue

4  here, consecutive or concurrent, because it's such a

5  significant period of time.

6          MR. MAYBERRY:  Right.  To that, Your Honor, I

7  mean, he's going to be incarcerated.  He's going to be

8  incarcerated for a significant period of time regardless.  I

9  think, in essence, time is time, whether he is in a federal

10  penitentiary or state court penitentiary.  The guidelines as

11  they call for this term -- and I know there is a ten-year

12  maximum for what he's got -- for his threshold charge, in

13  addition to the two years.

14          THE COURT:  Ten-year maximum.

15          MR. MAYBERRY:  Ten-year maximum.

16          THE COURT:  You are talking about statutory?

17          MR. MAYBERRY:  Yes, Your Honor.  Statutory

18  maximum.  He has what he has in state court.  I believe that

19  a sentence can be imposed that meets with the guideline of

20  3553(a) that it's reasonable but not greater than necessary

21  if there was at least a partial concurrence between this

22  sentence and what he has prior to.

23          If he is subject to a straight concurrent term,

24  he's going to be subjected to a prison sentence that even

25  with an 85 percent, assuming good behavior all the way around

1   for his federal term, he will be incarcerated until 2035.

2           The conduct we are here on today, it predated what

3   he's in state court for.  That's just a fact.  It doesn't

4   absolve the fact he's committed the state crimes; but if he

5   were to get a straight consecutive term, the amount of time

6   that he's going to be in prison -- he's going to be in prison

7   for the bulk of his adult years.

8           By the time he gets out, he's going to have

9   nothing and very likely no means to do anything in terms of

10  even attempting to make restitution.

11          He has served time in state court.  He does have

12  an electrical license.  I added that to my sentencing

13  memorandum.  That's something that he would strive to get

14  while he's in.  He's had an opportunity while he's been in to

15  evaluate where he's been in his life and where he wants to

16  go.

17          I've sat with this man on a number of occasions

18  throughout his case, and there is something in him where he

19  could make a change and he could do right in life.  He just

20  has to do it; and I think that at a minimum he deserves an

21  opportunity to try to do that at some point.  I'm afraid if

22  he's incarcerated until 2035, he's never realistically going

23  to have a good opportunity to do that.

24          I've gone through the nature and circumstances of

25  the offense.  I feel like we have gone through that very,

1    very well here.  Mr. Devlin has over the course of his

2    life -- he's one of the clients that I've had that I feel

3    like he's not had much of an opportunity.  The opportunities

4    that he has had he hasn't done much with it.  That's why he's

5    here.  But he was very much behind the eight ball from the

6    beginning.

7              There was no structure as a child in his life

8    with any effect or form, and that's from him.  He's been

9    incarcerated.  He's been the victim of sexual assault.  He's

10   been the victim of a sexual assault within the prison system.

11   He's a drug addict.  He definitely, I believe -- I would ask

12   Your Honor, while I'm on the topic, to ask for RDAP, is where

13   I'm going with that.

14             He has done much of this, like many others, due in

15   large part for his need for drugs and need to satisfy his

16   addiction.

17             THE COURT:  I need some more information about

18   those state cases.  I don't even know what they are about.

19   They are not detailed on the presentence report; are they,

20   Miss Campbell?

21             THE PROBATION OFFICER:  Nothing other than the

22   circumstances presented here.  We weren't provided with much

23   information about these three state cases, so just the

24   circumstances here that are listed.

25             THE COURT:  What's your position on whether they

1  ought to be -- if you have one, whether they ought to be

2  concurrent or consecutive?

3  　　　　　THE PROBATION OFFICER:  My position, Your Honor?

4  　　　　　THE COURT:  Do you have a position you wish to

5  tell the Court?  If you don't, that's fine.

6  　　　　　THE PROBATION OFFICER:  I listed my position in

7  the recommendation, Your Honor.

8  　　　　　THE COURT:  Okay.  Does the government have any

9  information about those state charges?

10  　　　　　MS. RIEDEL:  Your Honor, I just asked Miss

11  Canfield to look it up, and it basically just says this

12  burglary in Pasco County, which is detailed in paragraph 54,

13  that he received ten years.

14  　　　　　THE COURT:  That's a significant period of time.

15  Although probably based on his criminal history, the fact

16  that it's going -- is it going into somebody's house?  Is

17  that what it was?

18  　　　　　MS. RIEDEL:  Yes.  A car.

19  　　　　　MR. MAYBERRY:  A car, Your Honor.

20  　　　　　MS. RIEDEL:  A car.  But it's this repetitive --

21  we can look at the PSR and figure it out, but it's over and

22  over again.  We have this repetitive behavior.  The defendant

23  admitted on the stand breaking in, taking, using whatever he

24  finds.

25  　　　　　THE COURT:  Okay.  So it was breaking into a car.

1   That's basically it.  Is that what it was?

2          MS. RIEDEL:  Yes, Your Honor.  One of the agents

3   in preparation for this case obtained certified convictions

4   of the priors and produced them and the score sheet for this

5   particular case.  He was sentenced at the low end.

6          THE COURT:  The ten years is at the low end?

7          MS. RIEDEL:  That's what the agent is representing

8   to me was his understanding and reading from the records.  I

9   think the Court is surmising it's largely based upon the

10  repetitive nature and his criminal history, just based on the

11  information that we have.

12         MR. MAYBERRY:  Your Honor, with all due respect,

13  if this is a burglary of an unoccupied conveyance, that's a

14  third-degree felony, punishable up to five years.  He was

15  likely enhanced if he was getting that.  I don't know that

16  was on the low end of anything.

17         MS. RIEDEL:  Because once you do this a certain

18  number of times you can't charge it as a third-degree felony.

19  It's mandated by statute that it be -- but then the score

20  sheet, based on where he ends up -- well, you have it.  We

21  have it.  We could produce it to the Court, as to what his

22  judgment was.  But at the end of the day, as we sit here

23  today, I don't have any specific information other than

24  what's in --

25         THE DEFENDANT:  Can I tell you what happened?

1          THE COURT:  Why don't you talk to your lawyer

2    because it's better that you just get his consent before you

3    say anything.  So why don't you talk to Mr. Mayberry for a

4    moment.

5          (Discussion held off the record.)

6          THE PROBATION OFFICER:  I was able to have the

7    reports on my computer.

8          THE COURT:  Do you?  Okay.  Do you want to just

9    tell us what they summarize?

10         THE PROBATION OFFICER:  It's about 30 pages.

11         THE COURT:  Okay.  Well, that's all right.  Let me

12   hear what Mr. Mayberry has to say.  Thank you.

13         Mr. Mayberry.

14         MR. MAYBERRY:  I guess the thrust of my argument,

15   Your Honor, is if he is sentenced to a fully consecutive

16   prison term, it's going to subject him to a -- he is going to

17   go to prison until about 2035.

18         THE COURT:  Right.  And I know.  It seems -- I'll

19   just tell you, it seems a long time to me, too, given what's

20   occurred here.  I understand that, and that's why I'm

21   struggling with this, Mr. Mayberry.  The flip side is, these

22   crimes had nothing to do with each other.

23         MR. MAYBERRY:  I understand.

24         THE COURT:  And why should I -- in essence, you

25   are asking I give your client a break.  I mean, really

```
 1  knocking off, in essence -- well, it's credit for -- if it's
 2  concurrent, he's, in essence, getting ten years off.  Right?
 3  Ten years off.
 4           That's hard for me to do, too.  As hard as it is
 5  for me to sentence somebody to a significant period of time,
 6  you are asking me to give him ten years off of his sentence.
 7           MR. MAYBERRY:  I'm not.  I'm asking Your Honor to
 8  consider running part of this concurrent.  I understand that
 9  to come in front of Your Honor and to say, Your Honor, let's
10  just have a concurrent term, effectively there is no
11  incarceration for him on the federal case.
12           Please believe me.  I'm not coming in to insult
13  the Court with that.  What I'm asking for -- under the
14  guideline and under the statute, you have the discretion to
15  run at least part of it concurrent.  That's what I'm asking
16  Your Honor to consider doing, considering this was conduct
17  that was in 2012 and predated his current sentence.  There
18  were some factors about this.  He was indicted two weeks
19  before the statute of limitations ran.
20           THE COURT:  On this case.  In the federal case,
21  obviously.
22           MR. MAYBERRY:  Yes, Your Honor.  Anytime that
23  happens, as Your Honor knows, it limits -- he didn't
24  cooperate in this case against Marquis Thornton, but had
25  there been other individuals that may have been indicted, or
```

1   if there would have been a greater time period for which he

2   could cooperate, there could have been an opportunity for him

3   to offer some substantial assistance and hale in some people

4   possibly to face the music for things they did.

5           Given he was indicted two weeks prior -- and the

6   government, it's their prerogative to indict whenever they

7   want to indict within the statute of limitations.  I know

8   that.  But it does inhibit a defendant's ability to work with

9   their lawyer, get the proffer agreement, and have an

10  opportunity to cooperate against more than one individual.

11          THE COURT:  Okay.  I understand that.  What are

12  you proposing?  What's your proposal to the Court?  Because

13  if I were to go to the bottom of the guidelines -- which is,

14  of course, my inclination here.  If I would go to the bottom

15  of the guidelines, it's 116 months.  Ten years is 120 months.

16  So it's basically the federal case basically goes away.

17  Basically goes away.

18          MR. MAYBERRY:  On a full concurrent term.

19          THE COURT:  On a full concurrent term.

20          MR. MAYBERRY:  Your Honor, I know Your Honor is

21  not going to do that.

22          THE COURT:  I'm not.  I'm not going to do that.

23          MR. MAYBERRY:  My request, would you consider

24  running between three and five years of it concurrent with

25  the state term, which would give him at least an opportunity

1  to not have everything completely stacked and go away for 17

2  years.  The next 17 years is what it would end up being.

3          THE COURT:  Give me a moment to look at something

4  here.

5          (Brief pause.)

6          THE COURT:  I'm very disinclined to do that,

7  Mr. Mayberry.  It either means that the state case doesn't

8  count or the federal case doesn't count.  That's really what

9  you are asking me, and I'm not so certain that it's

10  appropriate to give your client three to five years off.

11          I've gone through this again.  It is a heavy hit

12  federally, but it's appropriate.  It's appropriate.  We are

13  carrying out here a congressional mandate and intent,

14  particularly with the consecutive.  I'm very disinclined.  I

15  mean, I've thought about it, but I don't think so.

16          Anything else the government wishes to say on

17  that?  Have I mis-analyzed this?  Do you think it's

18  appropriate to give him a portion of it concurrent?

19          MS. RIEDEL:  No, for the same reasons, Your Honor.

20  I think these arguments about his criminal history dovetail

21  into this.  The United States agrees with the Court to the

22  appropriateness of a consecutive sentence.

23          I think the way the statute actually lays it out

24  is that the Court absolutely has the discretion, but it's

25  generally not appropriate to give -- not "not appropriate."

1   But, generally, the Court is encouraged not to give

2   concurrent sentences where there is no relationship between

3   the offenses.

4            Here there is nothing about the characteristics or

5   conduct of this defendant that warrants it.  The only

6   argument is, wow, it's a really long time.  But the nature

7   and circumstances of his offenses and of his criminal history

8   and his disregard for the law suggests that it's appropriate.

9            THE COURT:  That's what I think.  So I'm sorry,

10  Mr. Mayberry.  I really need to deny that request.  I've

11  thought about it, but those sentences need to be consecutive.

12           Anything else you would like to say or argue?  I

13  mean, I will do the bottom of the guidelines, for whatever

14  that's worth.  So it will be 116 months.

15           Anything else you would like to argue, and then

16  I'll hear from your client before I impose sentence if your

17  client would like to say anything?

18           MR. MAYBERRY:  Your Honor, I think he will

19  probably have a statement in allocution.

20           THE COURT:  Anything else, Mr. Mayberry?

21           MR. MAYBERRY:  I would ask for at least you to

22  consider the low end of the guideline.

23           THE COURT:  I will do that, at a minimum.

24           All right.  Would you like to say anything,

25  Mr. Devlin, before I impose sentence?

1          THE DEFENDANT:  I got so many emotions running

2    through me right now.  Just be patient with me.

3          THE COURT:  Sure.  Take your time.

4          THE DEFENDANT:  One of the studies of psychology

5    was environmental behavior.  The person who studied this

6    said, if you gave him five infant babies and his own land to

7    raise them, he could raise them to be whatever he wanted them

8    to be.  In other words, these children become who they are

9    based off the conditioning of their environment.

10          When I was growing up, I was raised by my mother.

11   I mean, yes, my grandma and my mother.  My momma and daddy,

12   they aren't really in no relationship, and they was young

13   when they had me, too.  So they were still kind of, I would

14   consider, children raising a child.  So I feel like they

15   really didn't yet understand what it took to keep a child

16   focused and on the right track.

17          There are things I used to want to do when I was a

18   kid.  Play football, participate in after-school programs,

19   singing in the choir at school.  These things I never got a

20   chance to do.

21          Instead of spending my after-school time in sports

22   or after-school programs, I spent most of my time in the

23   neighborhood, roaming the streets where I was exposed to drug

24   dealing, shootings, killings, drugs, thieves.  Being exposed

25   to these things kind of enforced -- being exposed to all

1  these different activities kind of led me to become who I am.

2           I was sent to prison when I was 14 years old for

3  one year and one day.  Why?  I don't know.  Why was I sent to

4  prison and not the juvenile system?  I don't know.  I feel

5  like there was juvenile sanctions that could have been

6  imposed on me that would have gave me a more severe

7  punishment than that year and day they gave me in prison.

8           While I went to prison, I experienced traumatizing

9  things.  But prison didn't -- as a child, prison didn't teach

10  me anything.  It made me come out of prison with more pride.

11  It made me come out of prison having more pride and integrity

12  than living the life of crime that I did before I went in.

13  It taught me to live my life how I wanted to live my life;

14  and when I get caught by the police, take my time and go on

15  about my business.  That's what it taught me.  It taught me

16  that everyone in this courtroom besides me was wrong and I

17  was right.

18           As people grow older, they tend to mature.  They

19  tend to start understanding things that they didn't

20  understand before.  I have been experiencing that in the last

21  couple of years.  I have been realizing that the lifestyle

22  that I've been living ain't the one that I always want to

23  live.  It ain't the one that my momma raised me to live.

24  Being a criminal is not what my mama brought me into this

25  world to be.

1          I no longer want to be that.  Although that may

2    not sound truthful, based off the circumstances and the

3    situation right now, but I came to realize that people have

4    to go through things in order to make a change.  My

5    experiences have placed me in the situation where I had to

6    contemplate what I really want.  And this ain't what I want.

7          No matter what the outcome of this situation, the

8    sentencing here, I realize that my purpose in society as a

9    man is to give service to my community and not take away from

10   it.

11         When I come home ten years from now, 15 years from

12   now, however long I got to do, that's what my duty will be,

13   to serve.  That's all I got to say.

14         THE COURT:  All right.  That was very eloquent.

15   Thank you, Mr. Devlin.

16         Anything else before I pronounce sentence?

17         MS. RIEDEL:  Not from the United States,

18   Your Honor.

19         THE COURT:  The Court has asked the defendant why

20   judgment should not now be pronounced, and after hearing the

21   defendant's response --

22         MR. MAYBERRY:  Your Honor?

23         THE COURT:  I'm sorry, sir.

24         THE DEFENDANT:  My lawyer told me I would have a

25   chance to say something as far as relating to the things

1    that -- okay, I had some objections that I proposed to my

2    lawyer that he felt as if they were not relevant to me and my

3    case.  He said that he didn't want to make a frivolous claim.

4           My study and my research has led me to believe

5    that my Constitutional rights were being violated.  My Fifth

6    Amendment right to due process and my Sixth Amendment rights

7    to a jury trial.

8           Based off the application of 1(b)1.3, relevant

9    conduct, I was charged with conspiring to defraud the United

10   States government.  The conspiracy alleged three different

11   unlawful objects:  Grand theft, access device fraud,

12   aggravated identity theft.

13          One of the overt acts stated that a coconspirator

14   fraudulently filed nine tax returns, equalling an amount I

15   think would be equivalent to, like, $82,000.  I believe, if

16   I'm not mistaken, these overt acts, if I was to go to trial,

17   is what the government would intend to prove, which would be

18   an element of the crime.

19          In my PSI, the government alleged that -- I mean

20   the PSI alleged that there were 453 tax returns, totaling an

21   amount of $2 million.  These facts should have been -- these

22   facts, what was in the PSI of 453 tax returns that were being

23   filed, is the same as the facts that are equivalent to the

24   facts that was alleged in the indictment, that I feel they

25   should have been alleged in the indictment and I feel like --

1      I should have had the right for a jury to determine those

2      facts.

3              1(b)1.3 says that anything that was part of the

4      common scheme or the same course of conduct can be taken into

5      consideration when calculating the offense guideline.

6              The First Circuit observed that the commentary

7      described in the common scheme or plan and same course of

8      conduct require in both prongs that the potential relevant

9      conduct constitute an offense and that it must be criminal.

10             These facts that they alleged in my PSI are part

11     of the same -- are part of the common scheme or plan.  I

12     believe that's why they alleged it because it wasn't charged

13     in the indictment, but it was alleged in the PSI.  These

14     facts are elements of a separate, uncharged crime.

15             The federal Constitution provides that those

16     accused in a federal court have specific rights, such as the

17     right to be informed of the nature and cause of the

18     accusation, the right to be held to answer for a capital or

19     otherwise infamous crime on the indictment or presentment of

20     a grand jury and the right to be tried by an impartial jury

21     of the state in the district where the crime shall be

22     committed.

23             Amendment Five and Six.  Also, no member of this

24     Court disputes due process requires that every fact necessary

25     that constitutes a crime must be found beyond a reasonable

1    doubt by a jury if those rights have not been waived.

2              I feel like that right has been violated.

3              THE COURT:  Okay.  Well, Mr. Devlin, you pled

4    guilty, and you did not have to plead guilty.  You chose to

5    plead guilty, and there was an extensive colloquy between you

6    and the magistrate judge.  In this case it was Judge Wilson,

7    who is a very experienced magistrate judge, who's been a

8    magistrate judge since the 1970s.  There was an extensive

9    colloquy to make certain that you knew what you were giving

10   up.

11             If you wanted to go to trial, that was most

12   certainly your right.  You had that right, and I would have

13   been happy to have obliged you with a trial.  But once you

14   plead guilty, you say that in exchange for giving up your

15   right to a trial, you decide to plead guilty, and that means

16   that you get -- normally there are reductions in sentence

17   here for acceptance of responsibility, et cetera.  Those are

18   the risks that you take.  I mean, these are chances you take.

19   If you had gone to trial, you would be looking at an even

20   more significant sentence.

21             Just because you don't like the sentence -- I've

22   already told you what I'm going to sentence you to -- you

23   can't take it back because that's the way our system works.

24   I'm sorry that you are upset about it.  I'm sorry that you

25   feel that it's not fair or appropriate, but it is.  It is

1   fair.  This is the way our system works.

2            So we need to move forward now.  Is there anything

3   else that you would like to say before I impose sentence with

4   respect to an allocution?  Anything else you would like to

5   say, Mr. Devlin?

6            THE DEFENDANT:  I wasn't trying to deny that I

7   pled guilty.  I wasn't trying to take my sentence back.  I

8   was just trying to basically get the Court to understand that

9   I'm being sentenced for something I didn't plead guilty to.

10           THE COURT:  I determined that relevant conduct was

11  appropriate to be considered.  That was my determination.

12  There will be other avenues for you, to raise that on appeal.

13  You did not sign a plea agreement.

14           Did he, Miss Riedel?

15           MS. RIEDEL:  No, Your Honor.

16           THE COURT:  We went through that earlier.  If I

17  made a mistake, then those are matters that you can take up

18  with the appellate court.  And most certainly, if I'm wrong,

19  I happily stand corrected.  So those are appellate issues

20  that you can raise on appeal.  If I made a mistake, then it

21  will be corrected.  If I didn't make a mistake, then the

22  sentence stands.

23           THE DEFENDANT:  I was just trying to make sure

24  that that issue was preserved.

25           THE COURT:  It's preserved.  Your lawyer preserved

1   it.  He made those objections.  They are preserved.

2          THE DEFENDANT:  Okay.  I got one more thing to

3   say.

4          THE COURT:  Sure.

5          THE DEFENDANT:  According to the sentencing

6   guidelines 2X1.1, that's the sentencing guidelines they using

7   on me.  It says that based -- I mean, 2X1.1, conspiracies,

8   attempts, and solicitations.  Attempts, solicitations, and

9   conspiracies, not covered by specific offense guideline.  A,

10  base offense level.  The base offense level for the guideline

11  for the substantive offense, plus any adjustment for such

12  guideline for any intended offense conduct that can be

13  established to a reasonable certainty.  B, specific offense

14  characteristics.

15         If an attempt, decrease by three levels unless the

16  defendant can plead to all acts the defendant believes

17  necessary for substitution of the substantive offense or the

18  circumstances demonstrate that the defendant was about to

19  complete all such acts but for the apprehension or

20  interruption by some similar event beyond the defendant's

21  control.  Or B2.  If a conspiracy, decrease by three levels

22  unless the defendant or his coconspirators complete all of

23  the acts and conspire to believe necessary on their part for

24  the successful completion of substantive offense or the

25  circumstances demonstrate that the coconspirators were about

1   to complete all such acts but for the apprehension or

2   interruption by some similar event beyond the defendant's

3   control.

4          Probation officer didn't reduce the sentencing

5   guideline by those three levels for either being -- either

6   using specific characteristics of B2 as a conspiracy or as an

7   attempt.  I have a case right here saying that applies to

8   2B1.2, and that it does not exclude the application of it.

9          THE COURT:  Okay.  I don't think it's applicable.

10  Miss Campbell, anything you would like to add about that?

11         THE PROBATION OFFICER:  Your Honor, that's not how

12  that guideline works.  Particularly 2X1.1 states that you

13  have to jump out to another guideline, which is 2B1.1.  So if

14  you go to that guideline -- I don't know if you have a book

15  in front of you.

16         THE DEFENDANT:  I got it.

17         THE PROBATION OFFICER:  That's how we determined

18  the base offense level.  From that particular guideline,

19  that's when you go and consider the special offense

20  characteristics.  You don't revert back to it to do the minus

21  two and the minus three.

22         For that particular situation, it would be a case

23  where there is no base offense level, but you do have one

24  according to the circumstances in your indictment.

25         THE COURT:  Okay.  Mr. Devlin, if there is

1   anything else that you would like to add, the time for those

2   objections has passed.  I've gone ahead and allowed you to

3   ask these questions just so you can get it off your chest,

4   but we need to move on.

5               THE DEFENDANT:  All right.

6               THE COURT:  All right.  Anything else you would

7   like to say with respect to an allocution?

8               THE DEFENDANT:  That's it, ma'am.

9               THE COURT:  All right.  The Court has asked the

10  defendant why judgment should not now be pronounced, and

11  after hearing the defendant's response, the Court has found

12  no cause to the contrary.  The parties have made statements

13  on their behalf or have waived the opportunity to do so and

14  the Court has reviewed the presentence report.

15              Pursuant to Title 18, United States Code, Sections

16  3551 and 3553, it is the judgment of the Court that the

17  defendant, Tyrone Devlin, is hereby committed to the custody

18  of the Bureau of Prisons to be in prison for a total term of

19  116 months.  This consists of 92 months on each of Counts

20  One, Two, and Three, to run concurrently.

21              MS. RIEDEL:  I'm sorry, Your Honor.  Count One has

22  a statutory maximum of --

23              THE COURT:  Say that again.

24              MS. RIEDEL:  Count One has a --

25              THE COURT:  Is there an error here?

1          THE PROBATION OFFICER:  Count One shouldn't be

2     listed.  It's applicable to Counts Two and Three.

3          THE COURT:  Okay.  So no Count One.  Thank you.

4          MS. RIEDEL:  I'm sorry.

5          THE COURT:  No problem.  Not Count One, just

6     Counts Two and Three.

7          THE PROBATION OFFICER:  Yes.

8          MS. RIEDEL:  The Court can order 60 months as to

9     Count One and then 92 months to Counts Two and Three, with

10    all Counts One, Two, and Three to run concurrent.

11         THE COURT:  Thank you.  That's different

12    information than what I had here.  Thank you for clarifying

13    that.

14         So 60 months as to Count One, 92 months as to

15    Counts Two and Three, to run concurrently, and 24 months as

16    to Count Four, to run consecutively to all other counts.

17         Any issue with that, Miss Riedel?  Is that

18    correct, then?

19         MS. RIEDEL:  Yes, Your Honor.  Thank you.

20         THE COURT:  So the only error before was that

21    there is a maximum statutory penalty of 60 months as to Count

22    One.

23         MS. RIEDEL:  Yes, Your Honor.

24         THE COURT:  The terms of imprisonment imposed by

25    this judgment shall run consecutive with the defendant's term

1   of imprisonment imposed pursuant to the judgment in Case No.

2   15-CF-12827 of Hillsborough County Circuit Court in Florida,

3   Case No. 15-CF-13844 of Hillsborough County Circuit Court in

4   Florida, and Case No. CRC-15-08049-CFA-ES of Pasco County

5   Circuit Court in Florida.

6          Upon release from imprisonment, you shall serve a

7   three-year term of supervised release.  This term consists of

8   a three-year term as to Counts One, Two, and Three and a

9   one-year term as to Count Four, all such terms to run

10  concurrently.  While on supervised release, you shall comply

11  with the standard conditions adopted by the Court in the

12  Middle District of Florida.

13         In addition, you shall comply with the following

14  special conditions:  You shall participate in a substance

15  abuse program, outpatient and/or inpatient, and follow the

16  probation officer's instructions regarding the implementation

17  of this Court directive.

18         Further, you shall contribute to the costs of

19  these services, not to exceed an amount determined reasonable

20  by the probation office's sliding scale for substance abuse

21  treatment services.

22         During and upon the completion of this program,

23  you are directed to submit to random drug testing.  You shall

24  participate in a mental health treatment program, outpatient

25  and/or inpatient, and follow the probation officer's

1  instructions regarding the implementation of this Court

2  directive.  Further, you shall contribute to the costs of

3  these services, not to exceed an amount determined reasonable

4  by the probation office's sliding scale for mental health

5  treatment services.

6       You shall be prohibited from incurring new credit

7  charges, opening additional lines of credit, or obligating

8  yourself for any major purchases without approval of the

9  probation officer.  You shall provide the probation officer

10 access to any requested financial information.

11      The defendant having been convicted of a

12 qualifying felony shall cooperate in the collection of DNA as

13 directed by the probation officer.  The mandatory drug

14 testing requirements of the Violent Crime Control Act are

15 imposed.  The Court orders the defendant to submit to random

16 drug testing, not to exceed 104 tests per year.

17      The defendant shall pay restitution in the amount

18 of $435,499 to the Internal Revenue Service.  This

19 restitution obligation shall be payable to the Clerk,

20 United States District Court, for distribution to the victim.

21 Restitution shall be paid jointly and severely with Marquis

22 Thornton.

23      While in the Bureau of Prisons' custody, you shall

24 either, one, pay at least $25 quarterly, if you have a

25 non-UNICOR job, or, two, pay at least 50 percent of monthly

1   earnings, if you have a UNICOR job.  Upon release from

2   custody the defendant shall begin making payments of $150 per

3   month.  This payment schedule shall continue unless the

4   victim, the government, or the defendant notifies the Court

5   of a material change in the defendant's ability to pay and

6   the Court modifies the schedule.

7          The Court finds that the defendant does not have

8   the ability to pay interest and the Court waives the interest

9   requirement for the restitution.

10         Based on the financial status of the defendant,

11  the Court waives imposition of a fine.

12         There is a forfeiture.  I have not entered that

13  forfeiture order.  I was waiting for the hearing today before

14  doing that.  So today I will enter that preliminary order of

15  forfeiture, and it will upon its entry be turned into a final

16  order of forfeiture as well.  So that will be entered before

17  the conclusion of the day.  So that will be done.  I think --

18  what did I say?  That was 26,000, I think is what it is.

19         MS. RIEDEL:  I believe it's $26,852.35.

20         THE COURT:  Let me pull up the docket here so

21  there is no mistake.

22         MS. RIEDEL:  I think it's document 133, is the

23  motion.

24         THE COURT:  Let me find that.  You are absolutely

25  right.  The motion for forfeiture is document 133.  So I

1   think they sent an order over here.  I've just held off on it

2   until -- do you have an extra order?

3          MS. RIEDEL:  I do, Your Honor.

4          THE COURT:  Can I take that and sign it?

5          MS. RIEDEL:  Yes, Your Honor.

6          (Document tendered.)

7          THE COURT:  I just don't want there to be any

8   issues that it hasn't been taken care of before the

9   sentencing is over.  So I'm going to sign this.  Thank you

10  very much.

11         So I've signed this.  This will be docketed today.

12  I'll give it to the courtroom deputy.  It will be docketed,

13  and it's also made into a final order, as well, today.

14         It is further ordered that the defendant shall pay

15  to the United States special assessments totaling $400, which

16  shall be due immediately.

17         After considering the Advisory Sentencing

18  Guidelines and all of the factor identified in Title 18,

19  United States Code, Section 3553(a)(1) through (7), the Court

20  finds that the sentence imposed is sufficient but not greater

21  than necessary to comply with the statutory purposes of

22  sentencing.

23         I sentenced you at the bottom of the guidelines.

24  I stayed within the guidelines.  I didn't think it was

25  appropriate to make those sentences concurrent because they

1  were for different violations.  One had nothing to do with

2  the other.  So I think that a consecutive sentence is

3  appropriate.

4          The Court having pronounced sentence, does counsel

5  for the defendant or government have any objections to the

6  sentence or to the manner in which the Court pronounced

7  sentence other than those previously stated for the record?

8          Miss Riedel?

9          MS. RIEDEL:  No, Your Honor.

10          THE COURT:  Mr. Mayberry?

11          MR. MAYBERRY:  Your Honor, one last thing.  I

12  didn't hear you reference RDAP.

13          THE COURT:  I will do that in just one second.

14  Let me finish this colloquy, and then we will talk about RDAP

15  and any other recommendations.

16          MR. MAYBERRY:  Your Honor, I suspect Mr. Devlin

17  will want an appeal.  I will just restate my objections and

18  object to the sentence.

19          THE COURT:  Yes, sir.  We have it down there.

20  Thank you.

21          The defendant is remanded to the custody of the

22  United States Marshal to await designation by the Bureau of

23  Prisons.

24          You have the right of appeal from the judgment and

25  sentence within 14 days from this date.  Failure to appeal

1  within the 14-day period shall be a waiver of your right to

2  appeal.  The government may file an appeal from the sentence.

3         You are also advised that you are entitled to

4  assistance of counsel in taking an appeal; and if you are

5  unable to afford a lawyer, one will be provided for you.  If

6  you are unable to afford the filing fee, the Clerk of the

7  Court will be directed to accept the Notice of Appeal without

8  such fee.

9         One more thing.  I referenced this letter earlier

10  at sidebar.  I can file it as a court exhibit.  Mr. Mayberry,

11  do you want to consult with your client?  I did talk about it

12  at sidebar, but it is not part of the record.

13         Then, Miss Riedel, you can tell me, too, your

14  position on it.

15         MS. RIEDEL:  I would prefer that it be made a

16  court exhibit.

17         THE COURT:  Court exhibit.  Okay.  Mr. Mayberry?

18  I think that's the correct result, to make it a court exhibit.

19         MR. MAYBERRY:  I would like it to be a court

20  exhibit, Your Honor.

21         THE COURT:  I will call it Court Exhibit No. 1.

22  So it's a court exhibit.  It will be part of the record in

23  case the appellate court needs to look at that.

24         (Court Exhibit 1 received in evidence.)

25         THE COURT:  Let's see.  All right.  So where would

1    your client like to be housed, Mr. Mayberry?

2            MR. MAYBERRY:  He has a history with electrical.

3    There is a 48-month program for electrical apprenticeship at

4    Marianna.  That's where he would prefer.  If he can't go

5    there, they have a different program at Coleman.  It's close

6    to family.  So I guess, if a backup plan can be in place,

7    maybe Coleman.

8            THE COURT:  First choice is Marianna.  His second

9    choice is Coleman.  I recommend he be accepted into the

10   electrical apprentice program at Marianna.  If that's not

11   available, another electrical type of program.  I recommend

12   that he be allowed into the RDAP program.

13           Can you think of anything else you would like me

14   to recommend?

15           MR. MAYBERRY:  Not at this time, Your Honor.

16           THE COURT:  Okay.  Anything else from the

17   government that I may have overlooked that needs to be done?

18           MS. RIEDEL:  No, Your Honor.

19           THE COURT:  Thank you to all of you.

20           Anything else, Mr. Mayberry, that you can think

21   of?

22           MR. MAYBERRY:  Nothing further, Your Honor.

23           THE COURT:  Okay.  Anything from probation?

24           THE PROBATION OFFICER:  No, Your Honor.

25           THE COURT:  Okay.  Thank you.

1          We are in recess.

2          (Proceedings concluded at 4:57 p.m.)

3                    - - -

UNITED STATES DISTRICT COURT   )
                                )
MIDDLE DISTRICT OF FLORIDA      )


### REPORTER CERTIFICATE


        I, Scott N. Gamertsfelder, Official Court Reporter
for the United States District Court, Middle District of
Florida, do hereby certify that pursuant to Section 753,
Title 28, United States Code, that the foregoing is a true
and correct transcript from the stenographic notes taken by
the undersigned in the matter of *UNITED STATES vs. TYRONE
DEVLIN*, Case No. 8:17-cr-372-T-33TGW (Pages 1 through 140),
and that the transcript page format is in conformance with
the regulations of the Judicial Conference of the United
States.


  /s/ *Scott N. Gamertsfelder*, RMR, FCRR

  *Official Court Reporter*

                                Date: August 20, 2018